Joshua D. Brinen, Esq.
**BRINEN & ASSOCIATES, LLC**
330 Seventh Avenue, Suite 501
New York, New York 10001
Telephone: (212) 330-8151
Facsimile: (212) 227-0201
jbrinen@brinenlaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Veza Agency Network, LLC, a Delaware limited liability company, Veza Growth SPV, LLC, a Delaware limited liability company, and Veza Shadow LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>Yannick Lorenz,<br><br>Defendant. | Index No.: 26-7331<br><br>**VERIFIED COMPLAINT** |

Plaintiffs Veza Agency Network, LLC ("Veza"), a Delaware limited liability company, Veza Growth SPV, LLC ("VGSPV"), a Delaware limited liability company, and Veza Shadow LLC ("Veza Shadow" or "VZS") collectively, the "Plaintiffs"), a Delaware limited liability company, by and through its undersigned counsel, as and for its Complaint (the "Complaint") against Yannick Lorenz ("Lorenz" or "Defendant") allege as follows:

## NATURE OF THE ACTION

1. This action arises from Defendant Yannick Lorenz's alleged misuse of Plaintiffs' confidential and proprietary information, business relationships, acquisition opportunities, and

commercial resources while simultaneously developing and operating unauthorized paid coaching, consulting, advisory, and agency-related ventures for his own financial benefit.

2. Defendant founded and operated Shadow Digital, LLC ("Shadow Digital") and entered into an Asset Purchase and Contribution Agreement on November 25, 2024. See Exhibit 1 – Asset Purchase and Contribution Agreement.

3. Defendant entered into an Asset Purchase and Contribution Agreement in connection with Plaintiffs' acquisition of the Shadow Digital business. See Exhibit 1.

4. Defendant executed the agreement both on behalf of Shadow Digital and personally as an "Owner," and the transaction became effective February 11, 2025. See Exhibit 1.

5. The transaction included approximately $1.87 million in consideration and transferred, among other things, the value associated with Shadow Digital's goodwill, business relationships, customers, commercial information, processes, and other purchased assets including Notion recordings and transcripts. See Exhibit 1.

6. Defendant continued working within Plaintiffs' organization and, effective January 1, 2026, served as Chief Growth Officer pursuant to an Independent Contractor Agreement with Veza Agency Network, LLC and Veza Growth SPV, LLC. See Exhibit 2 – Independent Contractor Agreement.

7. In that role, Defendant was entrusted with substantial responsibility over Plaintiffs' sales, growth, strategic-partnership, and mergers-and-acquisitions functions and obtained access to sensitive customer, prospect, acquisition, financial, pricing, sales, CRM, and other proprietary information. See Exhibit 2; Exhibit 3 – Defendant Company Access and CRM Records; Exhibit 4 – Veza Confidential Commercial and M&A Records.

8. While subject to those contractual obligations and possessing access to Plaintiffs' confidential and proprietary information, Defendant allegedly developed and operated separate paid coaching, consulting, advisory, and agency-owner businesses, including ventures operating under the names Long Live Agencies and Kiya, in direct breach of Defendant's restrictive obligations under both the Asset Purchase and Contribution Agreement and Independent Contractor Agreement. See Exhibit 5 – Long Live Agencies, Kiya, and Outside Business Records.

9. Defendant offered, among other things, paid coaching programs, hourly consulting, fractional advisory services, and a paid agency-owner community. See Exhibit 5; Exhibit 6 – Company-Owned Coaching and Call Transcripts. See Exhibit 1. See Exhibit 2.

10. Plaintiffs allege that Defendant used relationships, information, commercial methods, and opportunities obtained through Plaintiffs to advance those outside ventures, including by soliciting persons already within Plaintiffs' systems and disclosing or using confidential acquisition information, pricing, sales methods, financial information, valuation methods, proprietary processes, and other protected commercial information. See Exhibit 3; Exhibit 6; Exhibit 7 – Defendant Email and Solicitation Records; Exhibit 4.

11. Plaintiffs provided Defendant written notice of default and an opportunity to cure on June 30, 2026, and delivered a written termination-for-cause notice dated July 15, 2026, with termination effective August 15, 2026. See Exhibit 8 – June 30, 2026 Notice of Default and Opportunity to Cure; Exhibit 9 – July 15, 2026 Termination for Cause Notice.

12. Plaintiffs revoked Defendant's authority to act for the Company and directed him to cease work, return Company information and property, preserve relevant records, and comply with his surviving contractual obligations. See Exhibit 8; Exhibit 9.

13. Defendant's allegedly competing conduct continued through Long Live Agencies' unauthorized coaching, consulting, advisory, and agency-related activities. See Exhibit 5; Exhibit 6; Exhibit 10 – Digidop CRM and M&A Relationship Records; Exhibit 11 – Digidop Call Transcript.

14. On July 15, 2026, after service of the termination notice, Defendant conducted a sales call with Digidop, an active Plaintiffs' M&A and strategic-partnership prospect that Defendant had helped develop for Plaintiffs and sold or attempted to sell his own approximately Seven Thousand and Five Hundred Dollars ($7,500) "Sellable Roadmap" program involving valuation, strategic planning, playbooks, templates, and agency-sale preparation. See Exhibit 10; Exhibit 11

15. During the second quarter of 2026, Plaintiffs had separately developed and presented a "Building a Sellable Agency" webinar series as part of Plaintiffs' M&A funnel-generation efforts. See Exhibit 10; Exhibit 11.

16. Plaintiffs bring this action to recover damages arising from Defendant's alleged contractual and statutory violations, protect Plaintiffs' confidential and proprietary information and business relationships, prevent further unauthorized use or disclosure of Plaintiffs' information, enforce applicable contractual obligations, and obtain declarations resolving the parties' disputed rights under the Profit Participation Agreement, SAFE, and Seller Note. See Exhibit 2; Exhibit 12 – Yannick Lorenz Profit Participation Agreement; Exhibit 1; Exhibit 13 – Amended Seller Note Agreement; Exhibit 14 – SAFE Agreement; Exhibit 15 - SAFE Adjustment Notice.

## PARTIES

17. Plaintiff Veza Agency Network, LLC is a Delaware limited liability company and, at all relevant times, conducted business through the Veza organization, including business involving digital-agency services, sales, growth, strategic partnerships, and mergers and acquisitions.

18. Plaintiff Veza Growth SPV, LLC is a Delaware limited liability company and is a party to the Independent Contractor Agreement pursuant to which Defendant served as Chief Growth Officer beginning January 1, 2026. See Exhibit 2.

19. The executed ICA identifies Veza Agency Network, LLC and Veza Growth SPV, LLC collectively as the "Company" and Defendant as the "Contractor." See Exhibit 2.

20. Plaintiff Veza Shadow, LLC is a Delaware limited liability company and is the Maker under the Amended Seller Note arising from the Shadow Digital acquisition transaction. See Exhibit 13.

21. Veza, VGSPV, and Veza Shadow are collectively referred to herein as "Plaintiffs."

22. Defendant Yannick Lorenz is a natural person residing in Newport Beach, California. Defendant founded and operated Shadow Digital and was its owner prior to Plaintiffs' acquisition of the business.

23. Defendant executed the Asset Purchase and Contribution Agreement on behalf of Shadow Digital and personally as an "Owner," thereby undertaking obligations associated with the sale of the Shadow Digital business. See Exhibit 1. The executed APA reflects Lorenz's signature both for Shadow Digital and separately as Owner.

24. Defendant continued providing services within Plaintiffs' organization and ultimately entered into the Independent Contractor Agreement pursuant to which he served as Plaintiffs' Chief Growth Officer. See Exhibit 2.

25. In that role, Defendant obtained access to Plaintiffs' confidential information, proprietary materials, customer and prospect relationships, acquisition targets, and M&A pipeline. See Exhibit 3; Exhibit 4.

**JURISDICTION**

26. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action asserts claims arising under federal law, including the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs' Complaint expressly asserts claims under both federal statutes. See 28 U.S.C. §§ 1331, 1338(a).

27. Jurisdiction is further proper pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiffs and Defendant.

28. Plaintiffs Veza Agency Network, LLC, Veza Growth SPV, LLC, and Veza Shadow LLC are limited liability companies whose members are citizens of Serbia and Canada.

29. On information and belief, Defendant Yannick Lorenz is a citizen of the Federal Republic of Germany who has been lawfully admitted to the United States for permanent residence and is domiciled in California and is therefore deemed a citizen of California for purposes of 28 U.S.C. §1332(a).

30. No Plaintiffs' members are citizens of the same state as Defendant. See 28 U.S.C. § 1332(a).

31. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiffs' state-law claims because those claims arise from the same transactions, occurrences, contractual relationships, and course of conduct as Plaintiffs' federal claims and therefore form part of the same case or controversy under Article III of the United States Constitution. See 28 U.S.C. § 1367(a).

## VENUE

32. Venue is proper in the United States District Court for the Southern District of New York pursuant to the Parties' valid and enforceable forum-selection clause in the parties' Independent Contractor Agreement. See 28 U.S.C. § 1391(b); Exhibit 2, § 7.2.

33. The Independent Contractor Agreement provides that any action arising out of the Independent Contractor Agreement shall be brought solely in a state court located in New York County, New York, the United States District Court for the Southern District of New York, or another federal court located in New York, New York. See Exhibit 2.

34. The parties further expressly agreed to submit to the exclusive jurisdiction and venue of such courts. See Exhibit 2, § 7.2. Accordingly, the parties contractually selected and consented to the Southern District of New York as an exclusive federal forum for actions arising out of the Independent Contractor Agreement. See Exhibit 2, § 7.2.

35. The Amended Seller Note provides that it shall be governed by, and construed in accordance with, the laws of the State of Delaware. See Exhibit 13, § 7.

36. The Asset Purchase and Contribution Agreement provides that it shall be governed by and construed under the laws of the State of Delaware, without regard to conflicts-of-law principles that would require the application of any other law. See Exhibit 1, § 10.14.

37. The APA also contains a permissive forum-selection provision providing that proceedings arising out of or relating to the APA or the transactions contemplated thereunder **"may"** (emphasis added) be brought in the Delaware Court of Chancery, or, where that court lacks subject-matter jurisdiction, in the state or federal courts of Delaware. See Exhibit 1, § 10.6.

38. As the APA's forum-selection clause is permissive and not exclusive, it does not preclude venue in this Court.

## FACTS COMMON TO ALL CAUSES OF ACTION

### Plaintiffs acquire Shadow Digital Assets from Defendant through the APA

39. Defendant founded and operated the digital agency business known as Shadow Digital.

40. Defendant was the owner of Shadow Digital.

41. On November 25, 2024, Lorenz and Shadow Digital entered into an Asset Purchase and Contribution Agreement with Plaintiffs for the sale of substantially all of Shadow Digital's assets, including its goodwill, customer relationships, commercial information, processes, and other purchased assets (the "APA").

42. Lorenz signed the APA on behalf of Shadow Digital and personally as an "Owner."

43. The APA became effective February 11, 2025 (the "Closing Date"). See Exhibit 1 § 1.1

44. Defendant is the "Seller" under the APA. See Exhibit 1 § 1.1.

45. Plaintiffs are the "Buyer" under the APA. See Exhibit 1, Preamble.

46. The consideration for the acquisition was approximately One Million Eight Hundred Sixty-Five Thousand and Three Hundred Twenty Dollars ($1,865,320) and included cash

consideration, a Seller Note, and Simple Agreement for Future Equity ("SAFE") consideration. See Exhibit 14.

47. Defendant's execution of the APA bound Defendant to obligations associated with the sale of the Shadow Digital. See Exhibit.

48. The APA entitled Plaintiffs to the value associated with Shadow Digital's goodwill, business relationships, customers, commercial information, processes, and other Purchased Assets. See Exhibit 1.

49. Section 6.3 of the APA expressly provides that its restrictive covenants were a material inducement for Buyer to purchase the Purchased Assets. See Exhibit 1, § 6.3.

50. Section 6.3 establishes a three (3) year "Restricted Period" running from the Closing Date. See Exhibit 1, § 6.3.

51. Section 6.3 prohibits a Seller or Seller Party, from directly or indirectly, from investing in, owning, managing, operating, financing, controlling, advising, or rendering services to a Person engaged in or planning to become engaged in a marketing agency business within the geographic scope of the provision. See Exhibit 1, § 6.3.

52. Section 6.3 prohibits a Seller Party from assisting another person in engaging in, planning, or preparing for activity prohibited by that provision. See Exhibit 1, § 6.3(a).

53. The APA prohibits a Seller Party from soliciting, diverting, taking away, attempting to solicit, divert, or take away, or otherwise interfering with Buyer's business or relationships. See Exhibit 1, § 6.3(b).

54. Protected relationships include Plaintiffs' actual and prospective customers, clients, referral sources, business partners, suppliers, vendors, service providers, consultants, lenders,

investors, and other Persons with whom Buyer or its affiliates conduct business. See Exhibit 1, § 6.3(b).

55. The APA prohibits Defendant's solicitation, recruitment, hiring, engagement, or interference concerning current or former employees of Plaintiffs and its affiliates, subject to the agreement's general-solicitation exception. See Exhibit 1, § 6.3(c).

56. The Restricted Period and Section 6.3 restrictions continue through February 11, 2028. See Exhibit 1, § 6.3.

**Defendant's work with Plaintiffs under the Independent Contractor Agreement**

57. Upon execution of the APA Defendant continued working within Plaintiffs' organization.

58. Defendant initially served as Strategic Webflow Advisor.

59. Effective January 1, 2026, Defendant became Chief Growth Officer under an Independent Contractor Agreement with Veza Agency Network, LLC and Veza Growth SPV, LLC (the "ICA"). See Exhibit 2, §§ 1.1–1.2 and Schedule A.

60. The ICA was effective as of January 1, 2026. See Exhibit 2, Preamble.

61. The ICA instituted a fixed twelve (12) month term unless Defendant was terminated pursuant to its provisions. See Exhibit 2, Article III.

62. As Chief Growth Officer, Defendant was responsible for substantial portions of Plaintiffs' sales, growth, strategic-partnership, and mergers-and-acquisitions functions. See Exhibit 2.

63. Defendant's responsibilities included developing a sales pipeline, improving commercial processes, identifying and cultivating acquisition targets, evaluating potential

transactions, negotiating acquisitions, and assisting with acquisition strategy and integration. See Exhibit 2, Schedule A.

64. Defendant's responsibilities granted him access to highly sensitive and protected information.

65. That information included client and prospect identities, acquisition targets, target-company financial information, internal models, diligence materials, pricing, sales processes, proposals, templates, standard operating procedures, call recordings, CRM information, commercial strategies, and other proprietary materials. See Exhibit 3.

66. Defendant personally managed a substantial portion of Plaintiffs' Mergers and Acquisitions ("M&A") pipeline. See Exhibit 3; Exhibit 4.

67. Approximately Fifty-Five (55) out of Plaintiffs' Sixty-Six (66) M&A pipeline deals were assigned to Defendant in Plaintiffs' systems. See Exhibit 4.

68. Managing those opportunities was part of Defendant's responsibilities. See Exhibit 3; Exhibit 4.

69. The significance of those responsibilities is that they placed Defendant in a position of trust and gave him direct access to Plaintiffs' confidential acquisition pipeline, target relationships, valuation information, and transaction strategy. See Exhibit 3; Exhibit 4.

**Defendant's obligations under the Independent Contractor Agreement**

70. The ICA required Defendant to protect Plaintiffs' "Confidential Information". See Exhibit 2, §§ 6.11–6.12.

71. Article VI of the ICA, titled "Proprietary Rights," establishes Defendant's obligations concerning Plaintiffs' intellectual property, Work Product, Confidential Information,

proprietary business methods, customers, potential customers, employees, and contractors. See Exhibit 2, Article VI.

72. Section 6.1 provides that intellectual property rights in works, discoveries, and materials created, developed, or discovered by Defendant during his engagement, defined as "Work Product," belong solely to Plaintiffs. See Exhibit 2, § 6.1.

73. Section 6.1 further provides that Work Product created by or contributed to by Defendant is deemed work made for hire for the sole benefit of Plaintiffs and is owned exclusively by Plaintiffs upon its creation. See Exhibit 2, § 6.1.

74. Defendant agreed that all rights, title, and interest in such Work Product and related intellectual property rights are and will remain the sole and exclusive property of Plaintiffs. See Exhibit 2, § 6.1.

75. Section 6.1 prohibits Defendant from owning, using, pursuing, or otherwise exercising rights in or to such Work Product without Plaintiffs' prior written consent. See Exhibit 2, § 6.1.

76. Section 6.5 grants Defendant only a limited, non-exclusive, royalty-free license to use, reproduce, adapt, and modify Work Product for non-competitive purposes in connection with the performance of services described in Schedule A. See Exhibit 2, § 6.5.

77. The license does not authorize disclosure or use of Plaintiffs' confidential information, trade secrets, or proprietary business methods for Defendant's separate commercial ventures or for the benefit of third parties. See Exhibit 2, § 6.1.

78. Section 6.7 provides that Defendant has no right to access, use, reverse engineer, decompile, or create derivative works based upon Plaintiffs' proprietary technology, intellectual

property, or confidential know-how, except to the extent strictly necessary for Defendant to perform services under the ICA. See Exhibit 2, § 6.7.

79. Section 6.8 requires Defendant to promptly communicate and assign to Plaintiffs inventions, original works of authorship, developments, concepts, know-how, improvements, ideas, trade secrets, and other Work Product conceived, discovered, or developed during Defendant's engagement that relate to Plaintiffs' Confidential Information, result from work performed on Plaintiffs' behalf, are developed during Defendant's work hours, or are created using Plaintiffs' Work Product, equipment, supplies, or facilities. See Exhibit 2, § 6.8.

80. Section 6.11 requires Defendant to indefinitely maintain Plaintiffs' Confidential Information in the strictest confidence and prohibits Defendant from disclosing or permitting disclosure of such information without Plaintiffs' approval and except to the extent necessary to perform services under the ICA. See Exhibit 2, § 6.11.

81. Such proprietary information expressly includes customer requirements, customer lists, financial information, marketing information, and information concerning Plaintiffs' contractors, products, services, prices, sources, operations, and subsidiaries. See Exhibit 2, § 6.11.

82. Section 6.11 further requires Defendant, upon termination of the ICA, to return Confidential Information in his possession to Plaintiffs, including documents, data, specifications, records, and any reproductions or copies thereof, and provides that improper disclosure of Plaintiffs' Confidential Information constitutes a material breach of the ICA. See Exhibit 2, § 6.11.

83. Section 6.12 prohibits Defendant, during the term of the ICA and for twenty-four (24) months following its termination or expiration, from using Plaintiffs' Confidential Information for Defendant's own benefit or for the benefit of any third party without Plaintiffs' prior written consent. See Exhibit 2, § 6.12.

84. Section 6.12 further prohibits Defendant from using Confidential Information to engage in any business or activity that directly competes with Plaintiffs during that period. See Exhibit 2, § 6.12.

85. Section 6.13 prohibits Defendant, during the term of the ICA and for twenty-four (24) months following its termination, from taking away any of Plaintiffs' customers or potential customers that Defendant became aware of through performing services under the ICA and from soliciting or hiring away Plaintiffs' employees or contractors that Defendant became aware of through his services for Plaintiffs. See Exhibit 2, § 6.13.

86. Section 6.15 provides that Defendant acknowledges that a breach of the covenants contained in Article VI would cause irreparable injury to Plaintiffs and permits Plaintiffs to seek temporary, preliminary, and permanent injunctive relief in the event of such a breach. See Exhibit 2, § 6.15.

87. The ICA expressly provides that the covenants contained in Article VI survive Defendant's engagement with Plaintiffs. See Exhibit 2, Article VI.

**Defendant develops a separate paid agency business**

88. While bound to the APA and ICA, Defendant developed and operated separate paid coaching, consulting, advisory, and community businesses directed toward Webflow and digital agencies. See Exhibit 5; Exhibit 6.

89. The ventures were active by October 2025. See Exhibit 5; Exhibit 6.

90. The ventures were not authorized by Plaintiffs and were not disclosed as approved exceptions to Defendant's restrictive covenants.

91. Defendant's ventures operated under names that included "Long Live Agencies" and "Kiya."

92. On or about October 20 or 21, 2025, Lorenz entered into a paid Agency Academy Growth Program agreement with Kreshnik Beqi ("Beqi"). See Exhibit 5.

93. At least two of Defendant's early paid coaching agreements expressly identified Veza's playbooks by name as part of the materials or methods Defendant promised to provide through his separate paid program. See Exhibit 5.

94. On or about October 27, 2025, Defendant told Beqi during a coaching session that Beqi was one of five agencies Defendant was taking through the program. See Exhibit 5.

95. Defendant described those engagements as his "number one priority." See Exhibit 6.

96. On or about November 3, 2025, a Five Thousand Dollar ($5,000) invoice from Beqi was paid to Defendant. See Exhibit 16 – Defendant Compensation and Payment Records; Exhibit 5.

97. Defendant entered into additional coaching arrangements with Mateja Velinovic, Fionn Lennon, and other agency owners. See Exhibit 5; Exhibit 16; Exhibit 5.

98. Defendant's unauthorized business included six-week coaching programs generally priced at approximately Five Thousand Dollars ($5,000) to Six Thousand Dollars ($6,000). See Exhibit 5; Exhibit 6.

99. Defendant offered consulting services at approximately Five Hundred Dollars ($500) per hour. See Exhibit 5; Exhibit 6.

100. Defendant described fractional advisory engagements beginning at approximately Fifteen Thousand Dollars ($15,000) per month. See Exhibit 5; Exhibit 6.

101. Defendant operated a paid agency-owner community priced at approximately Ninety-Seven Dollars ($97) per month. See Exhibit 5; Exhibit 16.

102. The paid-agency community had approximately thirty (30) to forty (40) members. See Exhibit 5; Exhibit 6.

**Defendant violated the ICA and APA by using Plaintiffs' relationships, by using Plaintiffs' proprietary information, and by preforming an unauthorized download**

103. Defendant did not develop his private consulting business exclusively from relationships independent of his work for Plaintiffs.

104. Defendant used access, relationships, information, and commercial methods obtained through Plaintiffs to source, solicit, and serve customers for his separate ventures.

105. In multiple recorded sessions, Defendant expressly identified methods he was teaching as processes used by Plaintiffs. See Exhibit 6.

106. In recorded statements, Defendant admitted that Defendant's role with Plaintiffs gave Defendant access to agency owners who could become customers of his separate unauthorized business. See Exhibit 6.

107. In December 2025, Plaintiffs became aware that Defendant wanted to provide consulting services to other agencies. See Exhibit 7; Exhibit 6.

108. Defendant intentionally diverted Plaintiff's clients from the Veza client pipeline. See Exhibit 7; Exhibit 6; Exhibit 3; Exhibit 4.

109. Defendant provided services designed to divert Veza clients for compensation. See Exhibit 16; Exhibit 3; Exhibit 4; Exhibit 5.

110. Defendant's services inflated the value of the diverted clients. See Exhibit 7; Exhibit 6.

111. Defendant then reintroduced the diverted clients at the inflated rates as potential acquisitions for Plaintiffs. See Exhibit 7; Exhibit 6.

112. Defendant would have been compensated by Plaintiff for any acquisitions at the inflated rate. See Exhibit 2.

113. Defendant's private coaching contained specific APA and ICA protected proprietary information. See Exhibit 3; Exhibit 7.

114. In multiple recorded sessions, Defendant expressly identified methods he was teaching as processes used by Plaintiffs. See Exhibit 6.

115. On or about December 22, 2025, Defendant sought a carve-out that would permit him to consult for Verndale. See Exhibit 7.

116. Plaintiffs' Chief Executive Officer expressly raised concerns that intellectual property developed by Defendant through Veza belonged to Plaintiffs. See Exhibit 7.

117. On or about December 23, 2025, Plaintiffs' Chief Revenue Officer documented concerns that Defendant would advise Plaintiffs' competitors and potentially share Plaintiffs' M&A opportunities. See Exhibit 7.

118. On or about December 29, 2025, Plaintiffs rejected the requested carve-out. See Exhibit 7.

119. Defendant participated in unauthorized activity through his entity Shadow Realm, LLC in February through June of 2026. See Exhibit 16; Exhibit 5.

120. In February 2026, Defendant stated that he was tied to Plaintiffs because Plaintiffs had purchased Shadow Digital and because he believed restrictive obligations applied to him. See Exhibit 6.

121. Defendant sought analysis of the executed APA's restrictive-covenant provisions, specifically whether his California residence could affect enforceability. See Exhibit 7.

122. In March 2026, Defendant discussed the potential financial consequences of violating his obligations under the APA and ICA. See Exhibit 6; Exhibit 7.

123. Defendant referenced possible consequences involving the Seller Note and SAFE-related value. See Exhibit 6; Exhibit 1; Exhibit 13. See Exhibit 14; Exhibit 15.

124. Defendant referenced conducting certain activity without publicly associating himself with Veza. See Exhibit 6.

125. Defendant was particularly concerned with coaching because Plaintiffs previously told Defendant to stop coaching and because Plaintiffs communicated with many of the same prospective customers. See Exhibit 6; Exhibit 7.

126. In March 2026, Defendant described his intended approach to Plaintiffs as performing the "minimal effective dose." See Exhibit 17. - Google Workspace and Information Technology Audit Records.

127. On or about May 2026, Defendant was planning expanded agency-education and advisory offerings, including coaching, consulting, memberships, agency-exit preparation, and M&A related services. See Exhibit 5; Exhibit 6.

128. In May 2026, Defendant described another venture strategy as "stealth-ish" - further supporting an inference that Defendant intended to conceal his outside business activity from Plaintiffs while continuing to benefit from Plaintiffs' information and relationships**.** See Exhibit 6.

129. Defendant discussed allocating approximately three (3) to four (4) hours of focused work per day to Plaintiffs. See Exhibit 6.

130. On or about June 30, 2026, Plaintiffs delivered to Defendant a formal Notice of Default and Opportunity to Cure (the "Notice"). See Exhibit 8.

131. The Notice identified deficiencies in Defendant's performance under the ICA. See Exhibit 8.

132. Deficiencies included concerns regarding the time and effort devoted to Veza work and failure to satisfy applicable performance targets and responsibilities. See Exhibit 8.

133. Defendant was provided fifteen (15) days to cure the identified defaults (the "Cure Period"). See Exhibit 8.

134. On or about July 10, 2026, Defendant participated in a phone call in which Defendant expressed the concern that Plaintiffs would terminate his access and stated that he believed they should "download the drive folder" and "think about transferring… the drive folder so that we don't lose any of those files." See Exhibit 6.

135. Defendant further agreed that addressing his email and file access should be a priority before Plaintiffs could cut off his access. See Exhibit 6.

136. During the Cure Period, Plaintiffs audit records reflected substantial data-export activity associated with Defendant's Company Google Workspace account. See Exhibit 17.

137. On or about July 13, 2026, at approximately 18:59 UTC, a Google Takeout was initiated from Defendant's Veza account (the "Takeout"), shortly after Plaintiffs issued the Notice and before the Cure Period expired. See Exhibit 17; Exhibit 8.

138. During the Takeout, Defendant selected approximately sixty (60) Google products, including Gmail, Google Drive, Google Chrome-related information, contacts, calendar data, and other account information. See Exhibit 17.

139. On or about July 14, 2026, at approximately 16:08 UTC, Defendant's account successfully reauthenticated. See Exhibit 17.

140. Almost immediately after Defendant's reauthentication, the Google Takeout archive was downloaded. See Exhibit 17.

141. The archive contained approximately One Hundred and Thirty-Eight Thousand Five Hundred and Thirty-Two (138,532) Gmail messages and approximately Four Hundred and Sixty-Nine (469) Drive files. See Exhibit 17.

142. Of the Four Hundred and Sixty-Nine (469) Drive files owned by the account, approximately One Hundred Eighty (180) also appear in transfer logs and are individually identifiable. See Exhibit 17

143. The archive totaled 19.22 gigabytes. See Exhibit 17.

144. Plaintiffs' Information Technology review concluded that the Takeout was consistent with Google's "select all" takeout functionality. See Exhibit 17.

145. Plaintiffs' Google Workspace audit records identify approximately Three Thousand Two Hundred and Forty (3,240) distinct files associated with downloads, copies, or synchronization activity across the two relevant account identities. See Exhibit 17.

146. Approximately Two Thousand One Hundred and Five (2,105) distinct files were associated with Defendant's own account activity. See Exhibit 17.

147. Approximately One Thousand Two Hundred and Ninety-Five (1,295) were associated with the Shadow Digital identity. See Exhibit 17.

148. Plaintiffs identified approximately Two Hundred and Eighty-Six (286) external sharing grants to addresses outside its tenant domains. See Exhibit 17.

149. Plaintiffs' Information Technology analysis determined that approximately 97.5 percent of July 14, 2026, Shadow-side Drive activity reflected a registered synchronization client mirroring a shared drive. See Exhibit 17.

150. At approximately 22:09 UTC, a session associated with the Shadow Digital identity accessed multiple individually owned Plaintiffs files. See Exhibit 17.

151. The session did not identify a registered synchronization application.

152. Plaintiffs' Information Technology analysis distinguished the activity from recurring synchronization and identified it as browser-initiated activity. See Exhibit 17.

153. The files involved were individually owned by Veza users rather than ordinary files on the Shadow Veza shared drive. See Exhibit 17.

154. The session involved Plaintiffs project documents, migration materials, design questionnaires, internal briefs, videos, scopes of work, and other Plaintiffs-owned files. See Exhibit 17.

155. The audit records include documents relating to Windows USA, Kooth, Brand Institute, Forethought, and other Plaintiffs client or project matters. See Exhibit 17.

156. Plaintiffs identified specific proprietary and protected material accessed, downloaded, or made accessible outside ordinary Veza workflows.

157. Materials include (1) a Veza acquisition-target spreadsheet, (2) LinkedIn outreach information, (3) deal models, (4) financial information concerning acquisition targets, (5) an Audit Questionnaire template used by Veza Digital, LLC, (6) Company-to-Company transaction templates, (7) client briefs, (8) project plans, (9) migration materials, and (10) related Plaintiffs' commercial files. See Exhibit 17; Exhibit 4.

158. Plaintiffs' Information Technology audit also reflects third-party application access associated with Defendant's Company account. See Exhibit 17; Exhibit 4.

159. Personal automation clients held read or read-write access to Company Gmail and Drive resources during portions of 2026.

160. Plaintiffs' records identify a Notion AI connection that generated thousands of Drive read calls. See Exhibit 17.

161. Plaintiffs' records document Defendant's access to or retention of client materials, M&A information, sales materials, templates, call artifacts, and other commercial records. See Exhibit 4.

162. Plaintiffs possess recordings showing that Defendant offered Company sales-call recordings to an outside agency paying Defendant for coaching. See Exhibit 6.

163. Defendant disclosed Company sales methods, pricing, guarantee mechanics, acquisition information, labor models, valuation methods, and other internal commercial information during paid coaching calls. See Exhibit 6; Exhibit 4.

164. On or about July 15, 2026, Plaintiffs removed Defendant's administrative role from his Company account and suspended the account. See Exhibit 4.

165. Google audit records reflect the role removal at approximately 13:22 UTC and suspension at approximately 13:23 UTC. See Exhibit 4.

166. Plaintiffs delivered a written termination-for-cause notice to Defendant dated July 15, 2026. See Exhibit 9.

167. The termination notice provided that Defendant's termination would become effective Thirty (30) days later, on August 15, 2026. See Exhibit 9.

168. Plaintiffs revoked Defendant's authority to act on behalf of the Company. See Exhibit 9.

169. Plaintiffs directed Defendant to cease work for Plaintiff, return Company information and property, preserve records, and comply with contractual APA and ICA obligations surviving termination. See Exhibit 9.

170. In August 2026, Defendant communicated with multiple outside parties. See Exhibit 6; Exhibit 7.

171. Defendant stated that he believed restrictive obligations arising from his relationship with Plaintiffs remained in effect. See Exhibit 6; Exhibit 7.

172. On August 14, 2026, Defendant told a representative for client Phase56 that he believed a non-compete remained in place while he negotiated with Plaintiffs. See Exhibit 7.

173. On August 14, 2026, one day before Defendant's termination became effective, Defendant told a representative for client Phase56: "So I technically have a non-compete in place currently. So, everything that we do here together kind of needs to stay under wraps for at least the next month or so. And so please don't tell anybody that I'm involved in any way. Please don't make any announcements." See Exhibit 7.

174. In separate August conversations with representatives of RNO1, Dennis Onalaja, Tremayne Tatem, and Nuria Casanova, Defendant described restrictions as continuing to apply. See Exhibit 7.

175. Defendant continued discussing or pursuing agency consulting and M&A-related services despite knowing that his restrictive obligations remained in effect. See Exhibit 6; Exhibit 7.

176. Plaintiffs possess Google Meet recordings, Gemini-generated notes, and other Company call artifacts of many of these discussions. See Exhibit 6; Exhibit 7.

177. Plaintiffs' Information Technology collection identified approximately Five Hundred and Ninety-Seven (597) recordings, notes, chat logs, and related artifacts touched by one of the relevant identities. See Exhibit 6; Exhibit 7.

178. The recovered materials include coaching-session recordings of Defendant with Kreshnik Beqi, Mateja Velinovic, Fionn Lennon, Diogo Dantas, and others. See Exhibit 6; Exhibit 7.

179. Plaintiffs identified multiple payments associated with Defendant's unauthorized commercial venture. See Exhibit 6; Exhibit 7.

180. Payments include a (1) Five Thousand Dollar ($5,000) payment associated with Kreshnik Beqi, (2) multiple Stripe payments and payouts associated with Kiya, and (3) payments associated with Shadow Realm, LLC. See Exhibit 6; Exhibit 7.

**Defendant inappropriately solicits Beqi**

181. On or about November 25, 2025, Defendant told Beqi that Plaintiffs previously had been in acquisition discussions with Hype Digital. See Exhibit 6.

182. Defendant discussed the business model of that former acquisition target. See Exhibit 6.

183. Defendant provided the target's website during the coaching session. See Exhibit 6.

184. Defendant's disclosures violated Defendant's confidentiality obligations under the APA and ICA. See Exhibit 2; Exhibit 1.

185. Defendant's disclosures were not authorized by Plaintiffs. See Exhibit 2; Exhibit 1.

186. Defendant provided unauthorized proprietary information to outside agencies for the purpose of selling or delivering his own coaching, consulting, advisory, and agency-owner services. See Exhibit 6.

187. On or about October 20, 2025, Defendant entered into an Agency Academy Growth Program Coaching Agreement with Beqi. See Exhibit 5.

188. In the Agency Academy Growth Program Coaching Agreement with Beqi, Defendant includes, "Marketing Playbooks: Access to tested marketing systems used across Veza's portfolio." See Exhibit 5.

189. Defendant directly included Veza's proprietary information within Agency Academy Growth Program Coaching Agreement without Veza's authorization. See Exhibit 5; Exhibit 4.

190. On December 22, 2025, Defendant disclosed to Beqi Plaintiffs' competitive pricing position relative to three named competitors. See Exhibit 6.

191. Defendant disclosed Plaintiffs' approximate labor-cost and markup model. See Exhibit 6; Exhibit 4.

192. Defendant disclosed Plaintiffs' outbound timing and customer-acquisition strategy. See Exhibit 6.

193. Defendant further described a valuation scorecard used in Plaintiffs' processes. See Exhibit 6.

194. On information and belief, on or about April 29, 2026, Defendant conducted a Model Context Protocol ("MCP") Readiness Audit for beqi.co. See Exhibit 18 – Kreshnik Beqi MCP Readiness Audit and Implementation Proposal.

195. On or about April 30, 2026, Beqi requested the live event replay for Veza's MCP Masterclass. See Exhibit - Veza Confidential Commercial and M&A Records.

196. Defendant identified the MCP/AEO audit framework as a Plaintiffs-developed commercial product. See Exhibit 18.

197. Recordings reflect Defendant describing WAIO systems as being built or tested through Veza for broader use across Veza agencies. See Exhibit 18.

198. Defendant used Plaintiffs' intellectual property to develop an unauthorized relationship with Beqi. See Exhibit 18.

**Defendant inappropriately solicits Phunk Creative**

199. In October 2025, Phunk Creative was added to Plaintiff's CRM. See Exhibit 3.

200. On or about October 15, 2025, Plaintiff held an introductory call with Phunk Creative. See Exhibit 3; Exhibit 6.

201. In December 2025, Defendant used his Veza company email account to solicit and onboard Joe Crabtree and Joe Murray of Phunk Creative into Defendant's unauthorized Long Live Agencies. See Exhibit 3; Exhibit 7.

202. On or about January 20, 2026, Defendant subsequently marked Phunk Creative as "Not a fit" for Veza in Plaintiff's CRM. See Exhibit 3; Exhibit 7.

203. Phunk Creative was a Plaintiffs M&A prospect associated with a transaction opportunity managed by Defendant. See Exhibit 3; Exhibit 4; Exhibit 7.

**Defendant inappropriately solicits Velinovic**

204. On or about November 19, 2025, Defendant stated that Plaintiffs' acquired agencies had surpassed approximately One Hundred (100) active clients. See Exhibit 6.

205. Defendant disclosed to Velinovic that Plaintiffs had stopped certain outbound customer-acquisition activity because Plaintiffs believed greater value could be obtained from its existing client base. See Exhibit 19 – Mateja Velinovic Coaching Call Authenticated Transcripts.

206. On the same call, Defendant discussed a live Plaintiffs' acquisition target. See Exhibit 19.

207. Defendant disclosed approximate revenue and profit-margin information relating to that target. See Exhibit 19.

208. Defendant offered Velinovic access to contractors with whom he worked through Plaintiffs. See Exhibit 19.

209. On or about December 18, 2025, Defendant informed Velinovic of Plaintiffs' WAIO Trademark and taught Veza's proprietary information to Velinovic. See Exhibit 19.

210. Defendant disclosed the approximate price of the offer. See Exhibit 19.

211. Defendant explained its guarantee and rollover mechanics. See Exhibit 19.

212. Defendant described how Plaintiffs used the offering to transition customers into continuing retainers. See Exhibit 19.

213. Defendant offered to provide Velinovic recordings of recent sales calls so Velinovic could observe Lorenz's use of Veza's sales process. See Exhibit 19.

214. Those recordings were Company-owned sales-call recordings and were not authorized for use in Defendant's paid outside coaching business. See Exhibit 6; Exhibit 19.

**Defendant inappropriately solicits Digidop**

215. After service of the termination letter, at approximately 6:30 p.m. on July 15, 2026, Defendant conducted a follow-up sales call titled "Digidop | Sellable Roadmap." See Exhibit 11

216. Digidop was a Plaintiffs' M&A and strategic-partnership prospect. See Exhibit 10.

217. Defendant had personally participated alongside Veza Chief Executive Officer in developing the Digidop relationship for Plaintiffs during June 2025. See Exhibit 10.

218. Digidop was involved in active acquisition discussions at the time of the follow-up sales call. See Exhibit 10.

219. During the July 15 call, Defendant sold or attempted to sell Defendant's own "Sellable Roadmap" program to Digidop. See Exhibit 11

220. The proposed program was priced at approximately Seven Thousand Five Hundred Dollars ($7,500). See Exhibit 11

221. The program included valuation work, gap analysis, strategic planning, playbooks, templates, and advice intended to increase the agency's enterprise value. See Exhibit 10.

222. Defendant described developing a "Sellable Certified" offering associated with a network of acquisition buyers. See Exhibit 10.

223. Plaintiffs did not authorize Defendant's services or interactions with Digidop for Defendant's own benefit. See Exhibit 10.

**Defendant inappropriately solicits Lennon**

224. On or about December 1, 2025, Defendant entered into an Agency Academy Growth Program Coaching Agreement with Fionn Lennon. See Exhibit 5.

225. In the Agency Academy Growth Program Coaching Agreement with Fionn Lennon, Defendant includes, "Marketing Playbooks: Access to proven marketing systems tactics currently used across Veza Digital and its portfolio of four agencies." See Exhibit 5.

226. Defendant directly included Veza's proprietary information within Agency Academy Growth Program Coaching Agreement without Veza's authorization. See Exhibit 5; Exhibit 4.

**Defendant inappropriately solicits Gigantic**

227. On or about September 26, 2025, Defendant used a Veza email address to invite Tim Garrison and Betsy Price of the company Gigantic into his private community of agency owners. See Exhibit 7.

228. Gigantic and its principals already existed in Plaintiffs' customer relationship management system ("CRM'). See Exhibit 3.

229. Defendant copied a Veza executive on that solicitation. See Exhibit 3.

**Defendant inappropriately solicits Diego**

230. During a December 16, 2025, call with Diego Toda de Oliveira, Defendant explained that he had many conversations with agency owners because of his position with Plaintiffs. Oliveira had been added to Plaintiffs' CRM on or about October 9, 2025, and his record was supplemented with additional information approximately two weeks later. Defendant thereafter pursued Oliveira in connection with Defendant's separate business. See Exhibit 3; Exhibit 6.

231. Defendant stated that he learned about those businesses through his role with Plaintiffs and then began offering consulting services to them. See Exhibit 6.

232. Defendant described converting insights gained from his role with Plaintiffs into his six-week paid program. See Exhibit 6.

**Defendant inappropriately solicits Influx Digital**

233. On or about December 16, 2025, Defendant pitched James Whittall of Influx Digital. See Exhibit 20 – December 16, 2025 James Whittall and Influx Digital Call Authenticated Transcript.

234. Influx Digital also existed within Plaintiffs' CRM. See Exhibit 20.

235. During that pitch, Defendant described his six-week program as essentially the same process Plaintiffs used after acquiring an agency. See Exhibit 20.

236. Defendant explained that Plaintiffs used the process to increase acquired-agency revenue during approximately the first thirty (30) to sixty (60) days following acquisition. See Exhibit 20.

237. Defendant identified pricing as one of Plaintiffs' primary post-acquisition revenue levers. See Exhibit 20.

238. Defendant described the potential for material immediate revenue improvement through pricing changes. See Exhibit 20.

239. Defendant represented that he had buyers available for agencies interested in acquisition transactions. See Exhibit 20.

240. Defendant disclosed Plaintiffs' proprietary commercial and transaction information to outside agencies for personal financial gain. See Exhibit 6; Exhibit 4; Exhibit 20.

**Adjustment of the SAFE and Seller Note**

241. The parties' APA included a Business Adjustment mechanism in Schedule 1.4, §2(a). See Exhibit 1, Schedule 1.4, § 2(a).

242. Under Schedule 1.4, §2(a), if before the Twenty-Four (24) month anniversary of closing, an Owner either voluntarily resigned as a service provider to Buyer or its affiliates, other than due to death or disability, or was terminated by Buyer or its affiliates for Cause, then each payment due to Seller under that provision would be reduced by fifty percent. See Exhibit 1, Schedule 1.4, § 2(a).

243. Defendant was terminated for Cause effective August 15, 2026, under the Independent Contractor Agreement. See Exhibit 9.

244. Defendant's termination occurred before the Twenty-Four (24) month anniversary of closing. See Exhibit 9; Exhibit 1.

245. On August 14, 2026, effective August 15, 2026, Plaintiff issued a SAFE Adjustment Notice. See Exhibit 15.

246. As the Defendant had been terminated for cause within the Twenty-Four (24) month period, the Business Adjustment applied. See Exhibit 15.

247. Plaintiffs adjusted the relevant payment from Seven Hundred and Fifty Thousand Dollars ($750,000) to Three Hundred and Seventy-Five Thousand Dollars ($375,000), effective as of August 15, 2026. See Exhibit 15.

248. The SAFE Adjustment Notice did not purport to amend, modify, revalue, convert, or terminate the SAFE itself. See Exhibit 15; Exhibit 14.

249. The SAFE Adjustment Notice enforced Veza's adjustment rights under the APA, while leaving the SAFE's other terms, including conversion mechanics, valuation terms, rollover interests, liquidity-event treatment, and other rights and obligations, unchanged and in full force and effect. See Exhibit 15; Exhibit 14; Exhibit 1.

250. On or about September 30, 2025, the parties entered into that certain Amended Seller Note Agreement. See Exhibit 13.

251. The purpose of the Amended Seller Note was to document the deferred purchase-price obligation owed by Veza Shadow, LLC, as Maker, to Shadow Digital Creative Solutions, LLC, as Payee, in connection with the asset purchase transaction between the parties. See Exhibit 13.

252. The APA provided for a performance-based adjustment of the Seller Note. See Exhibit 13.

253. Beginning six (6) months after the Closing Date, and every three (3) months thereafter, the Seller Note could be recalibrated based on the acquired business's actual Net Operating Profit compared to the 2024 baseline Net Operating Profit. See Exhibit 1; Exhibit 13,

254. If actual average Net Operating Profit met or exceeded the 2024 baseline, the Seller Note payments would remain unchanged. See Exhibit 1.

255. If actual average Net Operating Profit fell below the 2024 baseline, the monthly payments would be adjusted proportionately to reflect the percentage decrease, or increase, if previously recalibrated downward, in all cases capped at 100% of the remaining note principal. See Exhibit 1.

256. The APA also gave Buyer the right to reassess and recalibrate the remaining Seller Note balance using updated financial metrics, with the 2024 baseline as the primary reference point. See Exhibit 1.

257. On or around December 18, 2025, Veza representatives advised Defendant that Veza was entitled to recalibrate and adjust the Seller Note pursuant to the APA. See Exhibit 13; Exhibit 1.

258. Following communications with Defendant, Veza elected not to exercise that adjustment right at that time. See Exhibit 13; Exhibit 1.

259. Plaintiff made that decision as a gesture of goodwill, based on its beliefs that Defendant was operating in good faith and that the business's financial performance would improve.

260. At the same time, Defendant was actively taking steps to compete with Veza and/or to assist Veza's direct competitors. See Exhibit 5; Exhibit 6; Exhibit 7.

261. On April 13, 2026, Plaintiff's issued a Notice of Recalibration and Amendment to the Seller Note. See Exhibit 21 – Seller Note Payment and Recalibration Records.

262. The basis for the recalibration was Buyer's contractual right under the APA and Seller Note to adjust the remaining Seller Note balance based on updated financial performance

metrics, using 2024 Net Operating Profit as the baseline. See Exhibit 1; Exhibit 13, § 1.4; Exhibit 21.

263. The Notice of Recalibration applied that contractual mechanism by comparing actual Net Operating Profit for the trailing twelve (12) months ended March 31, 2026 against the 2024 Baseline NOP. Exhibit 13, § 1.4; Exhibit 21.

264. Applying that formula resulted in a recalibrated principal balance of Four Hundred and Sixty-Five Thousand One Hundred Twenty Two Dollars and Ninety One Cents ($465,122.91). Exhibit 13, § 1.4; Exhibit 21.

265. The recalibration reflected a principal write-down of Three Hundred Thousand and Four Hundred Thirty Five Dollars and Thirty Six Cents ($300,435.36). Exhibit 13, § 1.4; Exhibit 21.

## FIRST CAUSE OF ACTION
## (Breach of Independent Contractor Agreement)

266. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

## LEGAL STANDARD FOR BREACH OF CONTRACT

267. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

268. A plaintiff establishes the existence of an enforceable agreement by establishing "an offer, acceptance of that offer, consideration, mutual assent, and an intent to be bound." Lamda Sols. Corp. v. HSBC Bank USA, N.A., 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021) (citing Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (N.Y. App. Div. 1st Dep't 2009)).

269. The element of breach is satisfied when there is "an unexcused failure" by one of the parties to "carry out the contract by doing what it requires or permits." See Nasdaq, Inc. v. Exch. Traded Managers Grp., 431 F. Supp. 3d 176, 240 (S.D.N.Y. 2019) (citing D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.E.2d 992 (N.Y. 1984)).

270. Under New York law, a court's construction of an unambiguous contract "is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." Nasdaq, Inc. v. Exch. Traded Managers Grp., 431 F. Supp. 3d 176, 227 (S.D.N.Y. 2019) (citing Beal Sav. Bank v. Sommer, 865 N.E.2d 1210 (N.Y. 2007)); See also Seabury Constr. Corp. v. Jeffrey Chain Corp., 289 F.3d 63, 68 (2d Cir. 2002).

271. Damages must not be "merely speculative, possible and imaginary, but they must be reasonably certain," and must "actually follow or may follow from the breach of contract." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007).

272. Damages may be proven where a plaintiff establishes it is more likely than not that damages were suffered. Weihai Lianqiao Int'l Coop. Grp. Co., Ltd. v. A Base IX Co. LLC, 799 F. Supp. 3d 195, 232 (S.D.N.Y. 2025) (citing Wakeman v. Wheeler & Wilson Mfg. Co., 4 N.E. 264 (N.Y. 1886)).

273. Causation is "an essential element of damages" in a New York breach of contract claim; a plaintiff must prove the defendant's breach directly and proximately caused the alleged resulting damages. Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (citing Wakeman v. Wheeler & Wilson Mfg. Co., 4 N.E. 264 (N.Y. 1886)).

**Plaintiffs' Entitlement to Relief**

274. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

275. Plaintiffs and Defendant entered into a valid and enforceable Independent Contractor Agreement (the "ICA"), effective as of January 1, 2026, pursuant to which Defendant agreed to serve as Plaintiffs' Chief Growth Officer and perform the services set forth in the ICA and Schedule A. See Exhibit 2. Lamda Sols. Corp. v. HSBC Bank USA, N.A., 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021).

276. Plaintiffs performed their obligations under the ICA by retaining Defendant, compensating him, and providing him access to the systems, personnel, information, and business relationships necessary to perform his contractual duties. See Exhibit 2; Exhibit 16; Exhibit 3. Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

277. In exchange, Defendant was required to perform his Chief Growth Officer responsibilities and comply with the ICA's obligations concerning Company information, Confidential Information, proprietary materials, work product, Company property, non-solicitation, and post-termination obligations. See Exhibit 2. The ICA's unambiguous provisions are enforceable according to their terms. Nasdaq, Inc. v. Exch. Traded Managers Grp., 431 F. Supp. 3d 176, 227 (S.D.N.Y. 2019); Seabury Constr. Corp. v. Jeffrey Chain Corp., 289 F.3d 63, 68 (2d Cir. 2002).

278. Defendant breached the ICA by operating separate paid coaching, consulting, advisory, and agency-related ventures while bound by the ICA, diverting time and commercial

opportunities from Plaintiffs, and using relationships obtained through his position with Plaintiffs to advance those outside ventures. See Exhibit 5; Exhibit 6; Exhibit 7.

279. An unexcused failure to perform contractual obligations constitutes breach. Nasdaq, Inc. v. Exch. Traded Managers Grp., 431 F. Supp. 3d 240 (S.D.N.Y. 2019).

280. Defendant further breached the ICA by using, disclosing, retaining, or exporting Plaintiffs' confidential and proprietary information outside authorized Company purposes, including pricing, sales methods, acquisition information, labor and markup models, valuation methods, customer and prospect information, and other internal commercial materials. See Exhibit 6; Exhibit 17; Exhibit 2. Nasdaq, Inc. v. Exch. Traded Managers Grp., 431 F. Supp. 3d 240 (S.D.N.Y. 2019).

281. On June 30, 2026, Plaintiffs served Defendant with a Notice of Default and Opportunity to Cure identifying deficiencies in his contractual performance and providing fifteen days to cure. See Exhibit 8.

282. Defendant failed adequately to cure the identified defaults. See Exhibit 8; Exhibit 17.

283. Plaintiffs terminated Defendant for Cause by written notice dated July 15, 2026, effective August 15, 2026, revoked his authority to act on behalf of Plaintiffs, and directed him to return Company property and information and comply with surviving contractual obligations. See Exhibit 9; Exhibit 2.

284. Defendant continued conduct inconsistent with those obligations, including pursuing outside opportunities involving Plaintiffs' business relationships and prospects. See Exhibit 3; Exhibit 4; Exhibit 6; Exhibit 11

285. Plaintiffs satisfy each element of their breach-of-contract claim because a valid agreement existed, Plaintiffs performed their obligations, Defendant failed to perform multiple obligations imposed by the ICA, and Plaintiffs suffered resulting damages. Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 799 (2d Cir. 2011); see also Exhibit 1-10.

**Causation and Damages**

286. As a direct and proximate result of Defendant's breaches, Plaintiffs suffered commercial losses, diversion of business opportunities and relationships, investigation and remediation expenses, loss of contractual protections, and other damages to be proven at trial totaling not less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004); see also Exhibit 16, Exhibit 6, Exhibit 17, Exhibit 11, Exhibit 22 – Plaintiffs' Damages and Remediation Costs.

**Relief**

287. Plaintiffs are entitled to recover all damages caused by Defendant's breaches, together with contractual remedies, interest, costs, and such other legal and equitable relief as the Court deems just and proper. See Exhibit 2.

**SECOND CAUSE OF ACTION**
**(Breach of Confidentiality Obligations)**

288. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR BREACH OF CONFIDENTIALITY OBLIGATIONS**

289. To establish a breach of confidentiality claim, a plaintiff must show that the parties either "stood in a relationship of imposing a duty of trust or confidentiality," or that the parties "entered into an agreement establishing such a confidential relationship." HC2, Inc. v. Delaney,

510 F. Supp. 3d 86, 101 (S.D.N.Y. 2020) (citing Stewart v. World Wrestling Fedn. Entm't Inc., 2004 U.S. Dist. LEXIS 26533 (S.D.N.Y. Jan. 11, 2005)).

290. A confidential relationship may arise explicitly under the terms of a contract or implicitly by the actions of the parties or other circumstances. HC2, Inc. v. Delaney, 510 F. Supp. 3d 86, 101 (S.D.N.Y. 2020).

291. A complaint for breach of confidentiality obligations or express non-disclosure provisions generally must include facts alleging (1) that the plaintiff possessed a trade secret or confidential information, and (2) that the defendant used that trade secret or confidential information in breach of an agreement, confidential relationship or duty, or as a result of discovery through improper means. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999).

292. A contractual agreement to keep information in the strictest confidence will inherently preclude the recipient from using such confidential information for the benefit of a competitor business. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 48 (2d Cir. 1999) (holding irreparable harm would be suffered by plaintiff in the absence of an injunction).

**Plaintiffs' Entitlement to Relief**

293. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

294. Plaintiffs and Defendant expressly established a confidential relationship through the Independent Contractor Agreement (the "ICA"), under which Defendant agreed to maintain Plaintiffs' Confidential Information in strict confidence, use such information only for authorized

Company purposes, and refrain from using or disclosing it for Defendant's own benefit or for the benefit of any third party. See Exhibit 2.

295. A confidential relationship may arise expressly by contract, and a breach-of-confidence claim may be maintained where the parties "entered into an agreement establishing such a confidential relationship." HC2, Inc. v. Delaney, 510 F. Supp. 3d 86, 101 (S.D.N.Y. 2020).

296. Through his role as Chief Growth Officer, Defendant obtained access to Plaintiffs' nonpublic information concerning customers, prospects, acquisition targets, pricing, financial information, sales processes, commercial offerings, guarantee structures, and other internal business matters. See Exhibit 2; Exhibit 3; Exhibit 4.

297. Courts applying New York law recognize that customer information, pricing policies, and other confidential business affairs may properly be protected through express confidentiality obligations. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 41, 44–46 (2d Cir. 1999).

298. Defendant breached those obligations through his paid coaching relationship with Mateja Velinovic. See Exhibit 23 – Mateja Velinovic Agency Academy Growth Program Agreement; Exhibit 19.

299. On or about November 19, 2025, Defendant disclosed to Velinovic nonpublic information concerning Plaintiffs' customer base, Plaintiffs' outbound customer-acquisition strategy, and a then-live Veza acquisition target, including approximate revenue and profit-margin information concerning that target. See Exhibit 4; Exhibit 23.

300. Such disclosures were outside the purposes for which Defendant was authorized to possess or use Plaintiffs' Confidential Information. See Exhibit 2; North Atl. Instruments, Inc. v. Haber, 188 F.3d 41, 44–46 (2d Cir. 1999).

301. Defendant continued those disclosures on or about December 18, 2025, when he taught Velinovic Plaintiffs' then-current WAIO commercial offering, disclosed its approximate pricing, explained Plaintiffs' guarantee and rollover mechanics, and described how Plaintiffs used the offering to transition customers into continuing retainers. See Exhibit 4; Exhibit 23.

302. Defendant further offered to provide Velinovic with recordings of recent Company sales calls so that they could observe Defendant's sales process. See Exhibit 6; Exhibit 4.

303. The use of confidential commercial information for the benefit of an outside business is inconsistent with an express obligation to keep such information confidential and not disclose it outside the company. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 41, 46-48 (2d Cir. 1999).

304. Defendant's disclosures to Velinovic were consistent with a broader course of unauthorized retention and use of Plaintiffs' protected information.

305. Plaintiffs' information-technology records reflect Defendant's access to or retention of Company sales materials, M&A information, templates, call artifacts, financial materials, and other commercial records. See Exhibit 17.

306. The ICA required Defendant to return Confidential Information upon termination, and Plaintiffs reiterated that obligation in the July 15, 2026 termination notice. See Exhibit 2; Exhibit 9.

307. North Atlantic likewise recognized the enforceability of an agreement requiring the return of documents containing confidential information following termination. North Atl. Instruments, Inc. v. Haber, 188 F.3d 41 (2d Cir. 1999).

308. Plaintiffs satisfy the requirements for breach of Defendant's confidentiality obligations because Defendant accepted an express contractual duty of confidentiality, obtained

Plaintiffs' protected information pursuant to that relationship, and thereafter used or disclosed such information outside authorized Company purposes and for the benefit of himself and third parties. HC2, Inc. v. Delaney, 510 F. Supp. 3d 86, 101 (S.D.N.Y. 2020); North Atl. Instruments, Inc. v. Haber, 188 F.3d 41, 44-48 (2d Cir. 1999); see also Exhibit 2, Exhibit 6, Exhibit 17, Exhibit 19, Exhibit 4., Exhibit 23.

**Causation and Damages**

309. As a direct and proximate result of Defendant's breach of his confidentiality obligations, Plaintiffs have suffered and continue to face competitive and commercial harm, loss of the confidentiality and exclusivity of protected business information, investigation and remediation expenses, and other damages in an amount to be proven at trial, but in an amount no less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). See Exhibit 19; Exhibit 4; Exhibit 22; see North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43–48 (2d Cir. 1999).

**Relief**

310. Plaintiffs are entitled to recover all damages directly and proximately caused by Defendant's breach of his confidentiality obligations, together with all contractual, legal, and equitable relief available under the ICA and applicable law. See Exhibit 2; Exhibit 9; see North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 41–48 (2d Cir. 1999).

**THIRD CAUSE OF ACTION**
**(Breach of Proprietary Rights/ Intellectual Property Obligations)**

311. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR BREACH PROPRIETARY RIGHTS/ INTELLECTUAL PROPERTY OBLIGATIONS**

312. Under federal statutory law, "intellectual property enforcement" is broadly defined to encompass laws protecting copyrights, patents, trademarks, other forms of intellectual property, and trade secrets. 15 USCS § 8112.

313. Under 18 U.S.C. § 1839(3), a "trade secret" is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information." 18 U.S.C. § 1839(3).

314. To bring a claim under 18 U.S.C. § 1839, a plaintiff must prove they are the "owner," the information is a "trade secret," and the information was "misappropriated." 18 U.S.C. § 1839.

315. "Owner" is defined as the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed. 18 U.S.C. § 1839(4).

316. "Trade secrets" include patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible. 18 USCS § 1839(3).

317. To legally qualify as a trade secret the information must (1) be subject to reasonable secrecy measures and (2) independent economic value. 18 U.S.C. § 1839(3)(a) and (b).

318. Reasonable secrecy measures is a case-specific inquiry and a question of fact that depends in significant part on the nature of the trade secret at issue. See, Mason v. Amtrust Fin. Servs., No. 19cv8364 (DLC), 2020 U.S. Dist. (S.D.N.Y. Mar. 23, 2020).

319. Trade secret information has independent economic value if it derives actual or potential economic value from not being generally known to, and not being readily ascertainable

through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 USCS § 1839(3)(b).

320. "Misappropriation" is defined as improperly acquiring another's trade secret or using or disclosing it without consent when the person knew or should have known it was improperly obtained, subject to a duty of confidentiality, or acquired by accident or mistake. 18 USCS § 1839(5).

**Plaintiffs' Entitlement to Relief**

321. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

322. Plaintiffs possess proprietary rights in Company-created work product, methodologies, commercial frameworks, templates, records, know-how, and related intellectual property used in Plaintiffs' business. See Exhibit 2.

323. Federal law recognizes that protectable intellectual property includes trade secrets and that trade-secret information may include methods, techniques, processes, procedures, programs, and compilations. 15 U.S.C. § 8112; 18 U.S.C. § 1839(3).

324. Under the ICA, work product and related intellectual property created during Defendant's engagement belonged exclusively to Plaintiffs, and Defendant was prohibited from using or claiming rights in such work product except as expressly authorized. See Exhibit 2.

325. The ICA further limited Defendant's use of Company work product to authorized, noncompetitive purposes and prohibited unauthorized use of Plaintiffs' proprietary technology and confidential know-how. See Exhibit 2.

326. Defendant obtained access to Plaintiffs' proprietary products, methods, commercial frameworks, and related records through his role as Chief Growth Officer and his authorized access to Plaintiffs' systems and business operations. See Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 17.

327. The ICA also required Defendant to maintain and provide records of covered work product and to assign covered inventions, concepts, know-how, improvements, and other work product connected to Plaintiffs' work or resources. See Exhibit 2.

328. Defendant breached those obligations through his dealings with Kreshnik Beqi. See Exhibit 2.

329. On April 29, 2026, while Defendant remained bound by the ICA, Defendant conducted an MCP Readiness Audit for beqi.co using a framework Plaintiffs identify as a Company-created commercial product. See Exhibit 18.

330. On or about April 29, 2026, one day after Beqi attended Plaintiffs' April 28, 2026 MCP/AEO masterclass, an MCP Readiness Audit for beqi.co was prepared and used as the basis for a proposed implementation engagement priced between approximately Twenty-Five Thousand Dollars ($25,000) and Fifty Thousand Dollars ($50,000). See Exhibit 18.

331. Plaintiffs' records reflect that the MCP/AEO framework was developed and used as part of Plaintiffs' own commercial offerings and methodology. See Exhibit 18.

332. Defendant's use of that framework to pursue and monetize an outside commercial engagement exceeded the uses permitted by the ICA and exploited proprietary material that Plaintiffs contend belonged to them. See Exhibit 2; Exhibit 5; Exhibit 18.

333. The statutory treatment of trade-secret information reinforces the proprietary character of the information at issue. 18 U.S.C. § 1839(3)(A)–(B).

334. Information may qualify as a trade secret where its owner takes reasonable measures to maintain secrecy, and it derives actual or potential economic value from not being generally known or readily ascertainable. 18 U.S.C. § 1839(3)(A)–(B).

335. Unauthorized use or disclosure of such information by a person who acquired it under a duty to maintain secrecy or limit its use constitutes misappropriation. 18 U.S.C. § 1839(5)(B). See also Mason v. Amtrust Fin. Servs., No. 19cv8364 (DLC), 2020 U.S. Dist. (S.D.N.Y. Mar. 23, 2020).

336. Plaintiffs satisfy the requirements of their claim for breach of Defendant's proprietary-rights and intellectual-property obligations because Plaintiffs possessed enforceable rights in the covered work product and proprietary materials, Defendant obtained access to those materials subject to express contractual restrictions, and Defendant used and commercialized Plaintiffs' proprietary MCP/AEO framework outside the purposes authorized by the ICA. See Exhibit 2, Exhibit 5; Exhibit 18; 18 U.S.C. § 1839(3), (5).

**Causation and Damages**

337. As a direct and proximate result of Defendant's breaches, Plaintiffs have suffered commercial and competitive harm, loss of control over proprietary work product and methods, and other damages in an amount to be proven at trial no less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). See Exhibit 18.

**Relief**

338. Plaintiffs are entitled to recover all damages caused by Defendant's breach of his proprietary-rights and intellectual-property obligations and to obtain all contractual, legal, and equitable relief necessary to protect Plaintiffs' ownership and control of their work product, proprietary methods, and related intellectual property. See Exhibit 2; Exhibit 18.

**FOURTH CAUSE OF ACTION**
**(Breach of Non-Solicitation Covenant)**

339. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR BREACH OF NON-SOLICITATION COVENANT**

340. Under New York law, a plaintiff asserting breach of contract must establish "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016).

341. A restrictive covenant is reasonable only if it "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388–89 (1999).

342. An employer has a legitimate interest in preventing a former employee from "exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 392 (1999).

343. New York courts have applied restrictive covenant principles to independent contractors. See Zellner v. Stephen D. Conrad, M.D. P.C., 183 A.D.2d 250, 253-54 (2d Dep't 1992).

344. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**Plaintiffs' Entitlement to Relief**

345. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

346. Plaintiffs and Defendant entered into the ICA, which contains an express non-solicitation covenant restricting Defendant, during the contractual term and for twenty-four (24) months following termination, from taking away or attempting to take away specified Plaintiffs' customers and potential customers learned of through Defendant's work for Plaintiffs. See Exhibit 2.

347. Under New York law, a claim for breach of contract requires formation of a contract, performance by the plaintiff, failure of the defendant to perform, and resulting damages. Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016).

348. The covenant protects a legitimate business interest because the covenant is directed to customer and prospective-customer relationships Defendant learned of through his work for Plaintiffs rather than prohibiting competition. See Exhibit 2.

349. New York recognizes a legitimate interest in preventing a former service provider from exploiting or appropriating customer goodwill created and maintained at the employer's expense. BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 391–92 (1999).

350. The covenant is reasonable in scope because it is limited to protected Plaintiffs' relationships learned of through Defendant's work and does not prohibit Defendant from pursuing unrelated business. See Exhibit 2.

351. A restrictive covenant is reasonable where it is no greater than necessary to protect the employer's legitimate interest, does not impose undue hardship, and is not injurious to the public. BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89 (1999).

352. Digidop was a Plaintiffs' M&A and strategic-partnership prospect, and Defendant personally participated alongside Plaintiffs' Chief Executive Officer in developing that relationship for Plaintiffs. See Exhibit 3; Exhibit 4; Exhibit 10.

353. Defendant knew of and developed the Digidop relationship through his work for Plaintiffs. See Exhibit 3; Exhibit 4; Exhibit 10.

354. On July 15, 2026, Plaintiffs delivered Defendant a written termination-for-cause notice, revoked his authority to act for Plaintiffs, directed him to cease Company work, and required continued compliance with surviving contractual obligations. See Exhibit 9; Exhibit 2.

355. The notice stated that contractual termination would become effective on August 15, 2026. See Exhibit 9.

356. Later that same day, Defendant conducted a sales call titled "Digidop Sellable Roadmap" and sold or attempted to sell his own commercial program to Digidop. See Exhibit 11; Exhibit 10.

357. Defendant proposed the program at approximately Seven Thousand Five Hundred Dollars ($7,500) and offered valuation work, gap analysis, strategic planning, playbooks, templates, and advice intended to increase Digidop's enterprise value. See Exhibit 11

358. Plaintiffs satisfy the requirements of their claim for breach of the non-solicitation covenant because the ICA contains an enforceable covenant protecting specified customer and prospective-customer relationships, Plaintiffs performed under the ICA, Digidop was a protected Plaintiffs' prospect known to Defendant through his work for Plaintiffs, and Defendant

nevertheless solicited that prospect for his own commercial benefit while the restriction remained in effect. See Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 10; Exhibit 11; Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 156 (2d Cir. 2016); BDO Seidman v. Hirshberg, 93 N.Y.2d 388–92 (1999).

**Causation and Damages**

359. As a direct and proximate result of Defendant's breach, Plaintiffs have suffered commercial and competitive injury, impairment of the goodwill and prospective business relationship Plaintiffs developed with Digidop, and other damages in an amount to be proven at trial no less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). See Exhibit 3; Exhibit 4; Exhibit 10; Exhibit 11 See BDO Seidman v. Hirshberg, 93 N.Y.2d 391–92 (1999).

**Relief**

360. Plaintiffs are entitled to recover all damages caused by Defendant's breach and to obtain appropriate contractual, legal, and equitable relief enforcing the non-solicitation covenant to the extent necessary to protect Plaintiffs' legitimate interests in their customer and prospective-customer relationships and goodwill. See Exhibit 2; Exhibit 10; Exhibit 11 See BDO Seidman v. Hirshberg, 93 N.Y.2d 395–95 (1999).

**FIFTH CAUSE OF ACTION**
**(Contractual Indemnification Under Independent Contractor Agreement)**

361. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR CONTRACTUAL INDEMNIFICATION**

362. Contractual indemnification disputes are governed under New York law. See generally Haynes v. Kleinewefers, 921 F.2d 453 (2d Cir. 1990).

363. Under New York law, contractual indemnification must be strictly construed and require a manifestation of an "unmistakable intent" to indemnify even if not made expressly. Haynes v. Kleinewefers, 921 F.2d 453 (2d Cir. 1990) (quoting Kurek v. Port Chester Housing Auth., 223 N.E.2d 25, 27 (N.Y. 1966)).

364. The unmistakable intent standard applies the scope of coverage by that indemnification clause. Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 54 (2d Cir. 1993).

**Plaintiffs' Entitlement to Relief**

365. The ICA contains an express indemnification provision requiring Defendant to indemnify, defend, and hold harmless Plaintiffs and specified affiliated persons from covered losses, liabilities, damages, costs, and expenses, including reasonable legal fees, arising out of or related to Defendant's performance under the ICA, subject to the exclusions stated in the agreement. See Exhibit 2. New York requires indemnification provisions to be strictly construed according to the obligations the parties unmistakably intended to assume. Haynes v. Kleinewefers, 921 F.2d 453, 456–57 (2d Cir. 1990).

366. The ICA's express language demonstrates an unmistakable intent to indemnify Plaintiffs for losses falling within the scope of that provision. See Exhibit 2.

367. The scope of that obligation is determined by the language of the agreement itself. Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51–55 (2d Cir. 1993).

368. Plaintiffs have incurred losses, costs, and expenses arising from matters connected to Defendant's performance under the ICA, the nature and amount of which will be established through Plaintiffs' records and discovery but not less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). See Exhibit 22.

369. Plaintiffs seek indemnification only to the extent those losses fall within § 7.1 and are not subject to an express contractual exclusion. See Exhibit 2.

370. Defendant has failed to indemnify Plaintiffs for losses properly covered by the ICA's indemnification provision. See Exhibit 2; Exhibit 22.

371. Plaintiffs satisfy the requirements of their contractual-indemnification claim to the extent they establish covered losses because the ICA contains a valid indemnity provision, Plaintiffs incurred losses within its scope, Defendant's duty to indemnify was triggered, and Defendant failed to indemnify Plaintiffs. See Exhibit 2; Exhibit 22; Haynes v. Kleinewefers, 921 F.2d 453, 456–57 (2d Cir. 1990); Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51–55 (2d Cir. 1993).

**Causation and Damages**

372. As a direct result of Defendant's failure to satisfy his contractual indemnification obligations, Plaintiffs have incurred covered losses, costs, and expenses in an amount to be proven at trial not less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). See Exhibit 2; Exhibit 22.

**Relief**

373. Plaintiffs are entitled to recover all losses, liabilities, damages, costs, expenses, and other amounts properly recoverable under the ICA's indemnification provision, together with such additional relief as the ICA and applicable law permit. See Exhibit 2; Haynes v. Kleinewefers, 921 F.2d 453, 456–57 (2d Cir. 1990).

**SIXTH CAUSE OF ACTION**
**(Breach of Profit Participation Agreement)**

374. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR BREACH OF PROFIT PARTICIPATION AGREEMENT**

375. Under New York law, a plaintiff asserting breach of contract must establish "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016).

376. In interpreting a written contract, a court's primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement." Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000).

377. A written contract that is unambiguous on its face "is enforced according to the plain meaning of its terms." Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P., 259 F. Supp. 3d 16, 33 n.9 (S.D.N.Y. 2017).

**Plaintiffs' Entitlement to Relief**

378. Plaintiffs and Defendant entered into the Profit Participation Agreement (the "PPA"), effective January 1, 2026, which governed Defendant's rights to receive Profit Share and related compensation subject to the conditions and limitations stated in the agreement. See Exhibit 12.

379. Under New York law, breach of contract requires formation, plaintiff performance, defendant nonperformance, and resulting damages. Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016).

380. The PPA expressly provides that, upon termination pursuant to the ICA other than termination without cause, Defendant must repay Profit Participation amounts that constitute

advances against future profits that have not been earned or realized, with repayment due within thirty days after the effective date of termination for Cause. See Exhibit 12; Exhibit 16.

381. The parties' contractual intent is determined principally from the language of their agreement. Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000).

382. The PPA separately provides that termination of Defendant's engagement results in forfeiture of Defendant's rights to unearned, unpaid, or future profit allocations and that no additional Profit Share accrues after the effective date of termination. See Exhibit 12. An unambiguous written agreement is enforced according to the plain meaning of its terms. Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P., 259 F. Supp. 3d 16, 33 n.9 (S.D.N.Y. 2017).

383. Plaintiffs terminated Defendant for Cause effective August 15, 2026, triggering the PPA's provisions governing forfeiture of future participation and, where applicable, repayment of unearned advances. See Exhibit 9; Exhibit 2; Exhibit 12.

384. Plaintiffs' paid Defendant Twenty-Five Thousand Dollars ($25,000) in Profit Participation amounts that Plaintiffs allege constitute unearned advances subject to repayment under the PPA following Defendant's termination for Cause. See Exhibit 16; See Exhibit 12; Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 156 (2d Cir. 2016).

**Causation and Damages**

385. As a direct result of Defendant's failure to perform his repayment obligations when due, Plaintiffs have suffered damages equal to the amounts Defendant was contractually required, but failed, to repay, in the amount Twenty-Five Thousand Dollars ($25,000). See Exhibit 16.

**Relief**

386. Plaintiffs are entitled to recover all amounts properly determined to be repayable under the PPA, together with such other contractual relief as the PPA and applicable law permit. See Exhibit 12; Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 157 (2d Cir. 2000).

**SEVENTH CAUSE OF ACTION**
**(Enforcement of Promissory Note)**

387. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR ENFORCEMENT OF PROMISSORY NOTE**

388. The creation of a promissory note, as well as the liability of the maker in a action brought for its enforcement, is governed by state law. Niles v. Palmer, 1999 U.S. Dist. LEXIS 17759, at *39 (S.D.N.Y. Oct. 22, 1999).

389. Under N.Y.U.C.C. §3-104(1), a written negotiable instrument must (1) be signed by the maker; (2) contain an unconditional promise or order to pay a sum certain; (3) be payable on demand or at a definite time; and (4) be payable to order. N.Y.U.C.C. §3-104(1)(a)-(d); See also Dammers v. Wells Fargo Bank, N.A., 2018 U.S. Dist. LEXIS 577, at *3-4 (S.D.N.Y. Jan 2, 2018).

390. The computation of payment must be made from the instrument itself without any reference to an outside source. N.Y. U.C.C. §3-106, Comment 1; See also Dammers v. Wells Fargo Bank, N.A., 2018 U.S. Dist. LEXIS 577, at *3-4 (S.D.N.Y. Jan 2, 2018).

391. A plaintiff establishes "prima facie entitlement to judgment as a matter of law" regarding liability for a promissory note when the plaintiff "show[s] the existence of a promissory note executed by the defendant and the failure of the defendant to pay in accordance with the note's

terms." See Dammers v. Wells Fargo Bank, N.A., 2018 U.S. Dist. LEXIS 577, at *4 (S.D.N.Y. Jan 2, 2018) (citing Hansraj v. Sukhu, 145 A.D.3d 755, 755-56 (2d Dept. 2016)).

**Plaintiffs' Entitlement to Relief**

392. In connection with Plaintiffs' acquisition of Shadow Digital, Veza Shadow, LLC, as Maker, and the applicable Shadow Digital payee entered into an amended Seller Note documenting deferred purchase-price obligations arising from the transaction. See Exhibit 13; Exhibit 1.

393. The creation and enforcement of a promissory note are governed by state law. Niles v. Palmer, 1999 U.S. Dist. LEXIS 17759, at *39 (S.D.N.Y. Oct. 22, 1999).

394. The Seller Note and related transaction documents govern the amount, timing, and conditions of payment, including applicable recalibration, default, cure, subordination, offset, and other limitations on enforcement. See Exhibit 13; Exhibit 1; Exhibit 21.

395. Under New York law, the rights created by a negotiable instrument are determined from the instrument's written terms, including its payment obligation and maturity provisions. N.Y. U.C.C. § 3-104(1)(a)–(d); Dammers v. Wells Fargo Bank, N.A., 2018 U.S. Dist. LEXIS 577, at *3–4 (S.D.N.Y. Jan. 2, 2018).

396. Plaintiffs have performed their obligations under the Seller Note, including to the extent performance was subject to contractual recalibration, offset, subordination, cure, or other rights provided by the governing transaction documents. See Exhibit 13; Exhibit 1; Exhibit 21.

397. Defendant and/or the Lorenz-controlled payee entities have asserted or may assert payment, default, acceleration, or other enforcement rights inconsistent with the Seller Note and related transaction documents. See Exhibit 13.

398. Plaintiffs are entitled to enforce the Seller Note according to its actual terms and to reject any demand exceeding the amounts or remedies properly available thereunder. See Exhibit 13; Exhibit 1; Dammers v. Wells Fargo Bank, N.A., 2018 U.S. Dist. LEXIS 577, at *3–4 (S.D.N.Y. Jan. 2, 2018).

399. Accordingly, Plaintiffs are entitled to enforcement of the Seller Note's payment, recalibration, default, cure, subordination, offset, and related provisions according to their terms. See Exhibit 13; Exhibit 21; Niles v. Palmer, 1999 U.S. Dist. LEXIS 17759, at *39 (S.D.N.Y. Oct. 22, 1999).

**Causation and Damages**

400. To the extent Defendant or a Lorenz-controlled payee has breached or attempted to enforce the Seller Note contrary to its terms, Plaintiffs have suffered or face contractual and financial injury, including exposure to amounts or remedies not properly due. See Exhibit 21.

**Relief**

401. Plaintiffs are entitled to enforcement of the Seller Note and related transaction provisions according to their terms, including recognition of all applicable recalibration, payment, cure, subordination, offset, and other contractual limitations, together with such further relief as the Court deems appropriate. See Exhibit 13; Exhibit 1.

**EIGHTH CAUSE OF ACTION**
**(Tortious Interference with Prospective Business Relations / Prospective Economic Advantage)**

402. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

403. Under New York law, a claim for tortious interference with prospective business relations requires a specific business relationship with a third party, the defendant's knowledge of that relationship and intentional interference with it, wrongful means or conduct undertaken solely out of malice, and injury to the relationship. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003).

404. The New York Court of Appeals has clarified that conduct constituting "wrongful means" for the third element of this test, may refer to conduct described in the Restatement (Second) of Torts §§768, Comment e and 767, Comment c, which including fraud or misrepresentation. Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1104 (N.Y. 2004) (answering certified question in Carvel Corp. v. Noonan, 350 F.3d 6, 23 (2d Cir. 2003)).

405. The plaintiff must allege tortious interference with "a specific identified business relationship with a third party" and the defendant must interfere by inducing that specific third party to cease doing business with the plaintiff. G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995).

**Plaintiffs' Entitlement to Relief**

406. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

407. Plaintiffs maintained a specific prospective business and economic relationship with Digidop, including an M&A and strategic-partnership opportunity that Defendant personally helped cultivate on Plaintiffs' behalf. See Exhibit 10; Exhibit 4.

408. A claim for tortious interference with prospective economic advantage requires a specific business relationship with a third party, Defendant's knowledge and intentional

interference, wrongful means or sole malice, and injury to the relationship. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003).

409. Defendant unquestionably knew of Plaintiffs' relationship with Digidop because he personally participated in developing that relationship for Plaintiffs and had access to Plaintiffs' CRM, acquisition pipeline, transaction strategy, and related commercial information. See Exhibit 3; Exhibit 4; Exhibit 10; Exhibit 12 – Veza Confidential Commercial and M&A Records.

410. New York requires interference with a specific identified third-party relationship, rather than interference with the public or a generalized market expectancy. G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995).

411. Defendant intentionally inserted his own competing economic interests into that relationship. See Exhibit 3; Exhibit 4; Exhibit 10; Exhibit 12 – Veza Confidential Commercial and M&A Records.

412. On July 15, 2026, Defendant conducted a follow-up sales call with Florian Bodelet of Digidop and attempted to sell Digidop his own "Sellable Roadmap" advisory program, including valuation, strategic planning, playbooks, templates, and agency-sale preparation, while Digidop remained a Plaintiffs' M&A prospect. See Exhibit 11; Exhibit 10; Exhibit 5.

413. Plaintiffs further allege that Defendant's interference was accomplished through wrongful means, rather than permissible marketplace persuasion alone, including the alleged misuse of Plaintiffs' confidential M&A information, commercial methods, and proprietary transaction knowledge in pursuing his own competing relationship with Digidop. See Exhibit 4; Exhibit 11; Exhibit 17.

414. Wrongful means may include fraud, misrepresentation, and other independently wrongful conduct and does not encompass mere persuasion directed at prospective business. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003).

415. By using Plaintiffs' confidential information and his knowledge of Plaintiffs' existing Digidop relationship to advance a competing advisory and M&A offering, Defendant interfered directly with Plaintiffs' opportunity to develop, preserve, and consummate their prospective relationship with Digidop.

**Causation and Damages**

416. As a direct and proximate result of Defendant's intentional interference, Plaintiffs suffered injury to their prospective Digidop relationship among others and resulting economic harm, including loss or impairment of the value associated with that business opportunity, in an amount to be proven at trial not less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). See Exhibit 22; Exhibit 10.

**Relief**

417. Plaintiffs are entitled to recover compensatory damages caused by Defendant's tortious interference with their prospective business relationship with Digidop, together with such other legal and equitable relief as the Court deems appropriate. See Exhibit 22; Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003).

**NINTH CAUSE OF ACTION**
**(Misappropriation of Trade Secrets)**

418. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

## LEGAL STANDARD FOR MISAPPROPRIATION OF TRADE SECRETS

419. The Defend Trade Secrets Act creates a civil cause of action for "the owner of a trade secret that is misappropriated" where "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

420. A "trade secret" includes specified forms of financial, business, scientific, technical, economic, or engineering information where the owner "has taken reasonable measures to keep such information secret" and the information "derives independent economic value, actual or potential, from not being generally known to" or readily ascertainable by another person who could obtain economic value from its disclosure or use. 18 U.S.C. § 1839(3).

421. "Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity." Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 800 (2d Cir. 2023).

422. The specificity requirement "places a defendant on notice of the bases for the claim being made against it" and permits the factfinder to determine whether the identified information "is, in fact, a trade secret." Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 801 (2d Cir. 2023).

423. The DTSA defines "misappropriation" to include the acquisition of another's trade secret by a person who "knows or has reason to know that the trade secret was acquired by improper means," as well as the unauthorized disclosure or use of a trade secret under the circumstances specified in the statute. 18 U.S.C. § 1839(5).

424. "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other

means," but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

**Plaintiffs' Entitlement to Relief**

425. Plaintiffs identify the following trade-secret categories with specificity: nonpublic MCP/AEO Readiness Audit scoring criteria, methodology, processes, and implementation framework; nonpublic acquisition-target and valuation materials; nonpublic pricing, labor-cost, markup, guarantee, rollover, and post-acquisition revenue-improvement methodologies; and nonpublic customer, prospect, and M&A pipeline information.

426. Plaintiffs owned and maintained proprietary commercial methods used in their agency-growth and artificial-intelligence services, including the nonpublic scoring criteria, methodology, processes, and implementation framework underlying Plaintiffs' MCP/AEO Readiness Audit. See Exhibit 2.

427. These identified methods constitute financial, business, technical, and economic information capable of trade-secret protection where reasonable measures are taken to preserve secrecy and the information derives independent economic value from not being generally known or readily ascertainable. 18 U.S.C. § 1839(3); Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 800–03 (2d Cir. 2023).

428. Plaintiffs took reasonable measures to protect those materials by limiting access through Company systems and contractual confidentiality restrictions and by prohibiting Defendant from using Plaintiffs' proprietary information and confidential know-how for unauthorized purposes or third-party benefit. See Exhibit 2; Exhibit 17.

429. The DTSA expressly requires reasonable measures to preserve secrecy, 18 U.S.C. § 1839(3)(A), and Defendant's contractual duties required him to maintain Plaintiffs' confidential and proprietary information and limit its use to authorized Company purposes. See Exhibit 2.

430. The identified trade secrets possessed independent economic value because Plaintiffs used the methodology as part of commercially valuable services and implementation offerings that competitors and outside agencies could exploit without incurring the time, expense, and effort required to develop the underlying methodology independently. See Exhibit 18.

431. The DTSA protects information deriving actual or potential economic value from remaining unknown and not readily ascertainable through proper means. 18 U.S.C. § 1839(3)(B).

432. Defendant misappropriated those trade secrets by using Plaintiffs' proprietary MCP/AEO methodology outside the authorized scope of his engagement and for his own commercial benefit.

433. On or about April 29, 2026, Defendant conducted an MCP Readiness Audit for Kreshnik Beqi and coupled that audit with a proposed implementation priced between approximately $25,000 and $50,000. See Exhibit 18; Exhibit 5.

434. Plaintiffs' records identify the MCP/AEO audit framework as a Plaintiff-developed commercial product and reflect Defendant's use of that framework in his unauthorized outside relationship with Beqi. See Exhibit 18.

435. Defendant's authorized access to Plaintiffs' information for Company work did not authorize him to use or disclose Plaintiffs' trade secrets for his separate commercial venture. See Exhibit 2; Exhibit 5.

436. The DTSA defines misappropriation to include unauthorized use or disclosure where the person knew or had reason to know the information was acquired under circumstances

imposing a duty to maintain its secrecy or limit its use, and "improper means" expressly includes breach of a duty to maintain secrecy. 18 U.S.C. §§ 1839(5)(B)(ii), 1839(6)(A).

437. Likewise, Syntel confirms that permission to possess confidential material for authorized services does not necessarily permit its use for competing purposes where continuing confidentiality restrictions limit that use. Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 800–03 (2d Cir. 2023).

**Causation and Damages**

438. As a direct and proximate result of Defendant's unauthorized use and misappropriation, Plaintiffs have suffered actual loss and injury to the secrecy and competitive value of their proprietary methodology, and Defendant obtained or sought commercial benefit from its unauthorized use, in amounts to be proven at trial. See Exhibit 22; Exhibit 18.

439. The DTSA permits recovery of actual loss and unjust enrichment caused by misappropriation, as well as an appropriate reasonable royalty where applicable. 18 U.S.C. § 1836(b)(3)(B).

**Relief**

440. Plaintiffs are entitled to damages to be proven at trial and no less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900) and appropriate injunctive relief preventing Defendant's actual or threatened unauthorized use or disclosure of Plaintiffs' trade secrets, together with all further relief authorized by the DTSA. See Exhibit 2; Exhibit 22; 18 U.S.C. § 1836(b)(3).

**TENTH CAUSE OF ACTION**
**(False Advertising/ Commercial Misrepresentation)**

441. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

## LEGAL STANDARD FOR FALSE ADVERTISING AND COMMERICAL MISREPRESENTATION UNDER THE LANHAM ACT

442. Section 43(a)(1)(B) of the Lanham Act imposes liability on any person who, in connection with goods or services, uses in commerce a "false or misleading description of fact, or false or misleading representation of fact" that, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin" of that person's or another person's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B); see Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 122 (2014).

443. To prevail on a false advertising claim under the Lanham Act, a plaintiff must establish that the challenged message is "(1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." Souza v. Exotic Island Enters., Inc., 68 F.4th 99, 118 (2d Cir. 2023) (quoting Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 65 (2d Cir. 2016)).

444. A plaintiff may establish falsity by demonstrating that the challenged advertisement is either literally false or, although not literally false, is likely to mislead or confuse consumers. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007). When an advertisement is literally false, consumer deception is presumed and a court may grant relief without reference to the advertisement's actual impact on the buying public. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

445. An advertisement may be literally false even though it does not expressly make a false assertion where its words or images, considered in context, "necessarily imply a false message." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007).

446. Where an advertisement does not convey an unambiguous false message but is alleged to be misleading, the plaintiff must support its claim with extrinsic evidence of consumer

deception or confusion. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

447. A false representation must be material to support a Lanham Act false advertising claim. See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 66 (2d Cir. 2016).

448. A false representation is material where the deception is "likely to influence purchasing decisions." See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 70–71 (2d Cir. 2016).

449. To constitute "commercial advertising or promotion" under the Lanham Act, a representation must be: (1) commercial speech; (2) made for the purpose of influencing consumers to purchase the defendant's goods or services; and (3) sufficiently disseminated to the relevant purchasing public. See Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir. 2004) (citing Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56, 57-58 (2d Cir. 2002)).

450. "Commercial advertising or promotion" is not limited to traditional advertising campaigns, but requires sufficient dissemination to the relevant purchasing public. See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56 (2d Cir. 2002).

451. The relevant inquiry is whether the representations are part of an organized campaign to penetrate the relevant market. See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002).

452. Isolated disparaging statements are insufficient to constitute "commercial advertising or promotion" under the Lanham Act. See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002).

453. A plaintiff bringing a false advertising claim under Section 1125(a) must allege an injury to a commercial interest in reputation or sales proximately caused by the defendant's misrepresentations. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 140 (2014).

454. A plaintiff ordinarily satisfies the proximate-cause requirement by showing that its economic or reputational injury flows directly from the deception caused by the defendant's advertising, including where the deception of consumers causes them to withhold trade from the plaintiff. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133 (2014).

**Plaintiffs' Entitlement to Relief**

455. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

456. Defendant developed and operated separate paid coaching, consulting, advisory, and community businesses directed toward Webflow and digital agencies, including ventures operating under the names "Long Live Agencies" and "Kiya." Defendant marketed six (6) week coaching programs generally priced between approximately Five Thousand Dollars ($5,000) and Six Thousand Dollars ($6,000), consulting services at approximately Five Hundred Dollars ($500) per hour, fractional advisory engagements beginning at approximately Fifteen Thousand Dollars ($15,000) per month, and a paid agency-owner community with approximately thirty (30) to forty (40) members.

457. Plaintiffs allege that Defendant made false or misleading representations concerning the nature, characteristics, qualities, and origin of Defendant's commercial services by

marketing and selling Plaintiffs' commercial processes, methods, and proprietary information as components of Defendant's own paid offerings. See Exhibit 5; Exhibit 6; Exhibit 4.

458. Plaintiffs allege that these representations injured Plaintiffs' commercial interests, reputation, sales opportunities, and customer and prospective-customer relationships by enabling Defendant to compete for agency business using commercial methods and information belonging to Plaintiffs. See 15 U.S.C. § 1125(a)(1)(B); Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133, 140 (2014).

459. Defendant's representations were made for the purpose of selling his separate commercial services to agency owners.

460. In multiple recorded sessions, Defendant expressly identified methods he was teaching through his private coaching as processes used by Plaintiffs.

461. Defendant acknowledged that his position with Plaintiff provided him access to agency owners who could become customers of his separate business and explained that he learned about those businesses through his role with Plaintiff before offering consulting services to them. Defendant further described converting insights gained from his role with Plaintiff into his six-week paid program. See Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir. 2004).

462. On or about December 16, 2025, Defendant pitched his six (6) week paid program to James Whittall of Influx Digital, an entity already within Plaintiffs' CRM. In promoting that program, Defendant described it as essentially the same process Plaintiff used after acquiring an agency and explained that Plaintiff used the process to increase acquired-agency revenue during approximately the first thirty (30) to sixty (60) days following acquisition.

463. Defendant identified pricing as one of Plaintiffs' primary post-acquisition revenue levers and represented that material immediate revenue improvement could be achieved through pricing changes.

464. Defendant similarly promoted and provided his paid services using Plaintiffs' existing commercial offerings and proprietary information. See Exhibit 5; Exhibit 6; Exhibit 4.

465. On or about December 18, 2025, Defendant taught Plaintiffs' WAIO commercial offering method to Velinovic, including the approximate price of the offer, its guarantee and rollover mechanics, and Plaintiffs' use of the offering to transition customers into continuing retainers. See Exhibit 19.

466. Defendant also offered to provide recordings of recent sales calls so Velinovic could observe Defendant's sales process. See Exhibit 19; Exhibit 6.

467. On December 22, 2025, Defendant disclosed Plaintiffs' competitive pricing position relative to three named competitors, approximate labor-cost and markup model, outbound timing, and a valuation scorecard used in Plaintiffs' processes. See Exhibit 6; Exhibit 4.

468. Defendant's use of Plaintiff-derived methods and information was not confined to a single agency or isolated interaction.

469. Defendant entered into coaching arrangements involving Kreshnik Beqi, Mateja Velinovic, Fionn Lennon, and other agency owners, operated a paid community containing approximately thirty (30) to forty (40) members, and solicited persons already present within Plaintiffs' systems.

470. Defendant also used his Veza company email account in connection with onboarding Joe Crabtree and Joe Murray of Phunk Creative into Defendant's unauthorized Long Live Agencies, despite Phunk Creative being a Plaintiff M&A prospect associated with a

transaction opportunity managed by Defendant. See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56–58 (2d Cir. 2002).

471. Defendant continued using Plaintiff-developed commercial products in connection with his unauthorized services.

472. On or about April 29, 2026, Defendant conducted an MCP Readiness Audit for beqi.co that was accompanied by a proposed implementation priced between approximately Twenty-Five Thousand Dollars ($25,000) and Fifty Thousand Dollars ($50,000).

473. Defendant identified the MCP/AEO audit framework as a Plaintiff-developed commercial product, and recordings reflect Defendant describing WAIO systems as being built or tested through Veza for broader use across Veza agencies. See Exhibit 18.

474. Defendant's representations concerning the source, nature, and qualities of the commercial methods and services he offered were material to the agency owners Defendant sought to convert into paying customers because those representations identified Plaintiffs' actual commercial processes and results as the basis for Defendant's competing paid offerings.

475. Defendant received payments associated with these unauthorized commercial ventures, including a Five Thousand Dollar ($5,000) payment associated with Kreshnik Beqi, multiple Stripe payments and payouts associated with Kiya, and payments associated with Shadow Realm, LLC. See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 70–71 (2d Cir. 2016).

**Causation and Damages**

476. As a direct and proximate result of Defendant's false or misleading commercial representations in interstate commerce, Plaintiffs have suffered injury to their commercial interests, reputation, sales opportunities, and existing and prospective customer relationships,

while Defendant obtained or sought commercial benefit by marketing competing services using Plaintiffs' commercial methods and information and identifying them as his own. See Exhibit 5; Exhibit 6; Exhibit 22; Exhibit 20; Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133, 140 (2014).

**Relief**

477. Plaintiffs are entitled to recover damages, including treble damages, attorneys' fees, and appropriate equitable and injunctive relief for Defendant's false or misleading commercial representations, including relief necessary to prevent further misrepresentations concerning the source, nature, characteristics, or qualities of Defendant's competing commercial services, together with such further relief available under the Lanham Act. See 15 U.S.C. § 1125(a)(1)(B); Exhibit 5; Exhibit 22; Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 140 (2014).

**ELEVENTH CAUSE OF ACTION**
**(Self-Dealing)**

478. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR SELF DEALING/FIDUCIARY DUTY**

479. Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary relationship; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011). A fiduciary relationship may exist irrespective of whether a person is classified as an employee or independent contractor where the circumstances demonstrate that the principal reposed trust and confidence in the other party and reasonably relied on that party's integrity and fidelity in matters entrusted to him. Pergament v. Roach, 41 A.D.3d 569, 571 (2d Dep't 2007).

480. A fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another and may exist where one party reposes confidence in another and reasonably relies upon the other's superior expertise or knowledge. Henneberry v. Sumitomo Corp. of Am., 532 F. Supp. 2d 523, 550 (S.D.N.Y. 2007).

481. Once a fiduciary duty is established, the plaintiff must show that the claimed breach involved "matters within the fiduciary obligation," and any finding of breach is limited to "matters relevant to affairs entrusted." Henneberry v. Sumitomo Corp. of Am., 532 F. Supp. 2d 523, 551 (S.D.N.Y. 2007).

482. Under New York's corporate opportunity doctrine, "corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023) (quoting Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC, No. 13-CV-4650 (JFK), 2015 WL 7078641, at *4 (S.D.N.Y. Nov. 12, 2015)).

483. A corporate opportunity includes "any property, information, or prospective business dealing in which the corporation has an interest or tangible expectancy or which is essential to its existence or logically and naturally adaptable to its business." Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023).

**Plaintiffs' Entitlement to Relief**

484. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

485. Defendant occupied a position of trust and confidence within Plaintiffs' organization. Irrespective of Defendant's classification as an independent contractor under the

ICA, the nature and scope of Defendant's role, including his substantial authority over Plaintiffs' sales, growth, strategic-partnership, and M&A functions, his management of approximately fifty-five of sixty-six M&A pipeline deals, and his direct access to Plaintiffs' most commercially sensitive information, gave rise to a fiduciary relationship founded upon the trust and confidence Plaintiffs reposed in Defendant. See Exhibit 2; Exhibit 3; Exhibit 4.

486. Defendant served in a strategic-advisory capacity and, effective January 1, 2026, became Plaintiffs' Chief Growth Officer. See Exhibit 2; Exhibit 3; Exhibit 4.

487. In that role, Defendant was entrusted with substantial portions of Plaintiffs' sales, growth, strategic-partnership, and M&A functions, including developing sales pipeline, improving commercial processes, identifying and cultivating acquisition targets, evaluating potential transactions, negotiating acquisitions, and assisting with acquisition strategy and integration. See Exhibit 2; Exhibit 3; Exhibit 4.

488. Defendant personally managed a substantial portion of Plaintiffs' M&A pipeline, with approximately fifty-five (55) of Plaintiffs' sixty-six (66) M&A pipeline deals assigned to Defendant. See Exhibit 3; Exhibit 4.

489. Plaintiffs allege that Defendant breached his fiduciary obligations by exploiting matters and proprietary information entrusted to him by Plaintiffs. See Exhibit 3; Exhibit 4; Exhibit 6; Exhibit; Exhibit 17.

490. For Defendant's own financial benefit, Defendant exploited prospective business opportunities, agency relationships, acquisition targets, confidential commercial information, and proprietary processes. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7.

491. Defendant used the position, information, and relationships entrusted to him to develop and operate unauthorized competing ventures and to pursue for himself commercial

opportunities belonging to, or in which Plaintiffs possessed an existing relationship or cognizable expectancy. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7; Exhibit 10; Exhibit 11

492. Plaintiffs were damaged through the diversion of those opportunities and relationships, the unauthorized exploitation of its confidential and proprietary information, and Defendant's use of Plaintiffs' resources and goodwill to generate personal commercial benefits. See Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011); Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023).

493. Defendant's self-dealing concerned the same affairs Plaintiff entrusted to him. While responsible for Plaintiffs' sales, growth, strategic-partnership, and M&A functions, Defendant developed and operated separate paid coaching, consulting, advisory, and community businesses directed toward Webflow and digital agencies. See Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6.

494. Those ventures included six (6) week coaching programs generally priced between approximately Five Thousand Dollars ($5,000) and Six Thousand Dollars ($6,000), consulting services at approximately Five Hundred Dollars ($500) per hour, fractional advisory engagements beginning at approximately Fifteen Thousand Dollars ($15,000) per month, and a paid agency-owner community. See Exhibit 5; Exhibit 6; Exhibit 16.

495. Defendant described his private agency engagements as his "number one priority." See Exhibit 6.

496. Defendant used relationships obtained through his work for Plaintiff to advance those ventures. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7.

497. On or about September 26, 2025, Defendant used a Veza email address to invite Tim Garrison and Betsy Price of Gigantic, whose principals already existed within Plaintiffs' CRM, into his private community of agency owners. See Exhibit 3; Exhibit 7.

498. Defendant acknowledged that his role with Plaintiff gave him access to agency owners who could become customers of his separate business. See Exhibit 6.

499. Defendant later explained that he learned about agency businesses through his role with Plaintiff and then began offering consulting services to them, converting insights gained from his work for Plaintiff into his six-week paid program. See Exhibit 6.

500. Defendant exploited Plaintiffs' commercial information and proprietary processes for his personal benefit. See Exhibit 5; Exhibit 6; Exhibit 4.

501. Defendant disclosed Plaintiffs' acquisition information, sales methods, pricing, guarantee mechanics, competitive pricing position, labor-cost and markup model, valuation methods, and other internal commercial information during paid coaching calls. See Exhibit 6; Exhibit 4; Exhibit 19.

502. Defendant expressly identified methods taught through his private coaching as processes used by Plaintiff and offered Company sales-call recordings to an outside agency paying him for coaching. See Exhibit 6; Exhibit 4; Exhibit 19.

503. Defendant further pursued Plaintiff-related opportunities through his unauthorized business. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 7; Exhibit 10; Exhibit 11

504. In December 2025, Defendant used his Veza company email account in connection with onboarding Joe Crabtree and Joe Murray of Phunk Creative into Defendant's Long Live Agencies, even though Phunk Creative was a Plaintiff M&A prospect associated with a transaction opportunity managed by Defendant. See Exhibit 3; Exhibit 4; Exhibit 7.

505. Defendant also conducted an MCP Readiness Audit for beqi.co accompanied by a proposed implementation priced between approximately Twenty-Five Thousand Dollars ($25,000) and Fifty Thousand Dollars ($50,000), despite Defendant identifying the MCP/AEO audit framework as a Plaintiff-developed commercial product. See Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023). See Exhibit 18.

506. Defendant's diversion of Plaintiffs' prospective business opportunities continued with Digidop. See Exhibit 10; Exhibit 11

507. Defendant had personally participated alongside Plaintiffs' Chief Executive Officer in developing the Digidop relationship for Plaintiff, and Digidop remained an active Plaintiff M&A and strategic-partnership prospect. See Exhibit 10.

508. On July 15, 2026, Defendant conducted a follow-up sales call with Digidop and sold or attempted to sell his own approximately Seven Thousand Five Hundred Dollars ($7,500) "Sellable Roadmap" program, which included valuation work, gap analysis, strategic planning, playbooks, templates, and advice intended to increase the agency's enterprise value. See Exhibit 11

509. Defendant further described an offering through which he would prepare agencies for sale and introduce them to potential acquirers. See Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023).

510. Defendant received financial benefits from the unauthorized ventures developed through the relationships, information, and opportunities available to him through Plaintiffs.

511. Plaintiff identified a Five Thousand Dollar ($5,000) payment associated with Kreshnik Beqi, multiple Stripe payments and payouts associated with Kiya, and payments associated with Shadow Realm, LLC. See Exhibit 16; Exhibit 5.

512. Defendant's knowing exploitation of affairs entrusted to him, including Plaintiffs' existing and prospective agency relationships, acquisition opportunities, commercial information, and proprietary processes, for Defendant's own financial benefit constitutes self-dealing and a breach of the fiduciary obligations Defendant owed to Plaintiffs. See Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011); Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023)

**Causation and Damages**

513. As a direct and proximate result of Defendant's alleged self-dealing and diversion of matters entrusted to him, Plaintiffs suffered injury through the diversion or impairment of existing and prospective business opportunities, unauthorized exploitation of confidential and proprietary information, misuse of Plaintiffs' resources and goodwill, and the personal financial benefits Defendant obtained from opportunities and relationships allegedly belonging to or developed through Plaintiffs. See Exhibit 16; Exhibit 5; Exhibit 22; Exhibit 10; Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011); Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023).

**Relief**

514. Plaintiffs are entitled to recover damages caused by Defendant's breach of fiduciary obligations and self-dealing, together with disgorgement or other equitable relief to the extent permitted by law for financial benefits obtained through Defendant's exploitation or diversion of matters entrusted to him. See Exhibit 16; Exhibit 5; Exhibit 22; Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011); Kleeberg v. Eber, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023).

**<u>TWELFTH CAUSE OF ACTION</u>**
**(Fraud)**

515. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR FRAUD**

516. Under New York law, a claim for fraud requires a plaintiff to establish a material misrepresentation of fact, falsity, knowledge of falsity, intent to induce reliance, justifiable reliance, and resulting injury. See <u>Cohen v. Koenig</u>, 25 F.3d 1168, 1172 (2d Cir. 1994).

517. A claim sounding in fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that the circumstances constituting fraud be stated with particularity. Fed. R. Civ. P. 9(b).

518. Particularity is satisfied where the complaint identifies the alleged misrepresentations, the speaker, and the time and place at which the representations were made. See <u>Cohen v. Koenig</u>, 25 F.3d 1168, 1173 (2d Cir. 1994).

519. To adequately plead scienter, a plaintiff must plead facts giving rise to a strong inference of fraudulent intent. See <u>Shields v. Citytrust Bancorp, Inc</u>., 25 F.3d 1124, 1128 (2d Cir. 1994).

520. Such an inference may be established by alleging facts demonstrating that the defendant had both motive and opportunity to commit fraud or by alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. See <u>S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.</u>, 84 F.3d 629, 634 (2d Cir. 1996).

521. A fraud claim may be premised upon misrepresentations or omissions collateral or extraneous to a contract, where the defendant owed a duty to disclose and the resulting injury is

distinct from a mere failure to perform contractual obligations. See Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994).

522. Under New York law, due diligence is not a separate element of a fraud claim. See Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. 1980).

523. Where the matters misrepresented are peculiarly within the defendant's knowledge, a plaintiff may justifiably rely upon the representations without conducting an independent investigation because the plaintiff lacks independent means of ascertaining the truth. See Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. 1980).

524. Such reliance may be justified even where a relatively modest investigation could have uncovered the truth. See Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. 1980).

**Plaintiffs' Entitlement to Relief**

525. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

526. Defendant occupied a position within Plaintiffs' organization that provided him substantial responsibility over Plaintiffs' sales, growth, strategic-partnership, and M&A functions. Under the ICA, Defendant was responsible for developing sales pipeline, improving commercial processes, identifying and cultivating acquisition targets, evaluating potential transactions, negotiating acquisitions, and assisting with acquisition strategy and integration. See Exhibit 2; Exhibit 3; Exhibit 4.

527. Defendant personally managed a substantial portion of Plaintiffs' M&A pipeline and had direct knowledge of Plaintiffs' acquisition targets, target owners, pricing, relationships, and transaction strategy. See Exhibit 4.

528. Defendant knowingly concealed the nature, scope, and commercial purpose of his outside coaching, consulting, advisory, agency-owner, and M&A-related activities while continuing to request and maintain access to Plaintiffs' confidential information, proprietary processes, business relationships, and acquisition opportunities. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7; Exhibit 17.

529. Plaintiffs allege that Defendant had a duty to disclose those activities independent of his contractual obligations because the activities directly conflicted with the matters entrusted to him, were peculiarly within Defendant's knowledge, and affected Plaintiffs' decision whether to continue granting him access to sensitive Company systems, information, and opportunities. Defendant's concealment was not merely a failure to perform his contractual obligations; rather, Defendant made affirmative misrepresentations by continuing to hold himself out as performing his duties for Plaintiffs while secretly exploiting the access, relationships, and information Plaintiffs provided in reliance on those representations, causing Plaintiffs to suffer damages distinct from and in addition to those arising from breach of contract. See Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 7; Exhibit 17.

530. Defendant's concealment was material because Plaintiffs would have restricted or terminated Defendant's access to confidential information, M&A opportunities, CRM records, call recordings, client materials, acquisition-target information, and Company systems had Plaintiffs known that Defendant was using or intended to use those resources to advance undisclosed outside ventures for his own benefit.

531. Defendant's conduct demonstrates that his unauthorized business was substantial and ongoing while he continued working for Plaintiffs. Defendant's separate paid coaching,

consulting, advisory, and community ventures were active by October 2025 and included "Long Live Agencies" and "Kiya." See Exhibit 5; Exhibit 6; Exhibit 16.

532. On or about October 27, 2025, Defendant told Kreshnik Beqi that Beqi was one of five agencies Defendant was taking through his program and described those engagements as his "number one priority." See Exhibit 6.

533. Defendant knowingly used access obtained through Plaintiff to advance those ventures. See Exhibit 3; Exhibit 5; Exhibit 6; Exhibit 7.

534. On or about September 26, 2025, Defendant used a Veza email address to invite Tim Garrison and Betsy Price of Gigantic into his private community, despite Gigantic and its principals already existing within Plaintiffs' CRM. See Exhibit 3; Exhibit 7.

535. Defendant later acknowledged that his position with Plaintiff gave him access to agency owners who could become customers of his separate business. See Exhibit 6.

536. On or about December 16, 2025, Defendant explained that he learned about agency businesses through his role with Plaintiff and then began offering consulting services to them, and described converting insights gained from his position with Plaintiff into his six (6) week paid program. See Exhibit 6.

537. Defendant's knowledge and intent are further demonstrated by his communications concerning the restrictions imposed upon his outside activities. See Exhibit 6; Exhibit 7.

538. After Plaintiffs became aware in December 2025 that Defendant wanted to provide consulting services to other agencies, Defendant sought a carve out that would permit him to consult for Verndale. See Exhibit 7.

539. Plaintiffs' Chief Executive Officer expressly raised concerns that intellectual property developed by Defendant through Veza belonged to Plaintiff, and Plaintiffs' Chief

Revenue Officer documented concerns that Defendant would advise Plaintiffs' competitors and potentially share Plaintiffs' M&A opportunities. Exhibit 7.

540. Plaintiffs rejected Defendant's requested carve-out on or about December 29, 2025. Exhibit 7.

541. Defendant nevertheless continued pursuing the same type of unauthorized activity. Exhibit 7.

542. In February 2026, Defendant acknowledged that he was tied to Plaintiff because Plaintiff had purchased Shadow Digital and because he believed restrictive obligations applied to him. Defendant sought analysis concerning whether his California residence could affect the enforceability of the APA's restrictive covenants and later discussed the potential financial consequences of violating restrictions claimed by Plaintiffs. See Exhibit 6; Exhibit 7.

543. Defendant specifically recognized that coaching presented particular risk because Plaintiff previously had told him to stop coaching and because Plaintiff communicated with many of the same prospective customers. See S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996). See Exhibit 6; Exhibit 7.

544. Defendant's contemporaneous statements further demonstrate his awareness that his conduct conflicted with the obligations he owed Plaintiffs.

545. In March 2026, Defendant described his intended approach to his work for Plaintiff as performing the "minimal effective dose." See Exhibit 6; Exhibit 7.

546. In May 2026, Defendant described another venture strategy as "stealth-ish" and discussed allocating approximately three (3) to four (4) hours of focused work per day to Plaintiffs. See Exhibit 6; Exhibit 7.

547. At the same time, Defendant continued expanding agency-education and advisory offerings involving coaching, consulting, memberships, agency-exit preparation, and M&A-related services. See Exhibit 5; Exhibit 6.

548. Plaintiff continued to provide Defendant access to commercially sensitive information while Defendant pursued these unauthorized activities. See Exhibit 3; Exhibit 4; Exhibit 17; Exhibit 4.

549. During the Cure Period following Plaintiffs' June 30, 2026, Notice of Default, substantial data export activity occurred through Defendant's Company Google Workspace account, including a Google Takeout involving approximately sixty Google products. The resulting archive contained approximately One Hundred and Thirty-Eight Thousand Five Hundred and Thirty-Two (138,532) Gmail messages and approximately Four Hundred and Sixty-Nine (469) Drive files and totaled approximately 19.22 gigabytes. See Exhibit 17; Exhibit 8.

550. Plaintiffs' audit subsequently identified thousands of files associated with download, copy, or synchronization activity and hundreds of external sharing grants. See Exhibit 17.

551. Defendant obtained a personal financial benefit from the activities he pursued while continuing to hold himself out to Plaintiff as performing his responsibilities within Plaintiffs' organization. See Exhibit 16; Exhibit 5; Exhibit 6.

552. Plaintiffs identified payments associated with Defendant's unauthorized commercial ventures, including a Five Thousand Dollar ($5,000) payment associated with Kreshnik Beqi, multiple Stripe payments and payouts associated with Kiya, and payments associated with Shadow Realm, LLC. See Exhibit 16; Exhibit 5.

553. Plaintiffs were injured by continuing to entrust Defendant with valuable commercial information, relationships, opportunities, and access while Defendant knowingly exploited those resources for his own undisclosed commercial benefit. See Cohen v. Koenig, 25 F.3d 1168, 1172–73 (2d Cir. 1994). See Exhibit 16; Exhibit 5.

**Causation and Damages**

554. As a direct and proximate result of Defendant's alleged concealment and misrepresentations concerning his outside commercial activities, Plaintiffs continued to entrust Defendant with access to valuable confidential information, proprietary processes, business relationships, acquisition opportunities, and Company systems that Plaintiffs otherwise could have restricted or withdrawn, causing Plaintiffs commercial harm, loss or impairment of business opportunities, investigation and remediation expenses, and other damages in an amount to be proven at trial no less than Three Million Eight Hundred and Eighty-Eight Thousand Nine Hundred Dollars ($3,888,900). See Exhibit 2; Exhibit 3; Exhibit 5; Exhibit 17; Exhibit 22; Cohen v. Koenig, 25 F.3d 1168, 1172–73 (2d Cir. 1994).

**Relief**

555. Plaintiffs are entitled to recover damages directly and proximately caused by Defendant's fraudulent concealment and misrepresentations, together with such additional legal or equitable relief as may be available upon proof of Defendant's fraud and resulting injury. See Exhibit 5; Exhibit 17; Exhibit 22; Cohen v. Koenig, 25 F.3d 1168, 1172–73 (2d Cir. 1994).

**THIRTEENTH CAUSE OF ACTION**
**(False Association / False Designation of Origin)**

556. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR FALSE ASSOCIATION/FALSE DESIGNATION OF ORIGIN**

557. Section 43(a)(1)(A) of the Lanham Act imposes liability on any person who, in connection with goods or services, uses in commerce any word, term, name, symbol, device, false designation of origin, or false or misleading representation of fact that "is likely to cause confusion, or to cause mistake, or to deceive" as to the affiliation, connection, or association of that person with another person, or as to the origin, sponsorship, or approval of that person's goods, services, or commercial activities by another person. 15 U.S.C. § 1125(a)(1)(A).

558. To succeed on a claim under Section 43(a)(1)(A), a plaintiff must prove "(1) that the mark or dress is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 154 (2d Cir. 2007).

559. A plaintiff must establish "a probability of confusion, not a mere possibility," affecting "numerous ordinary prudent purchasers." Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383 (2d Cir. 2005).

560. Confusion does not have to be in regard to the actual source of goods or services. "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.

561. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383 (2d Cir. 2005) (quoting Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204–05 (2d Cir. 1979)).

562. A false-association claim therefore reaches confusion concerning an "affiliation, sponsorship, or other connection" between the parties or their products. Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383–84 (2d Cir. 2005).

563. In determining likelihood of confusion, courts consider the factors identified in Polaroid Corp. v. Polarad Electronics Corp. "the strength of [the] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).

564. "No one of those factors is dispositive, and the list is not exhaustive." Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C., 182 F.3d 133, 139 (2d Cir. 1999) (citing Polaroid, 287 F.2d at 495).

565. Evidence of actual confusion is not confined to mistaken, completed transactions; "evidence of actual confusion regarding affiliation or sponsorship is also entirely relevant to the ultimate likelihood-of-confusion inquiry." Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C., 182 F.3d 133, 141 (2d Cir. 1999).

566. Section 43(a)(1)(A) reaches conduct "likely to deceive as to the affiliation, connection, or association" of the defendant with the plaintiff. Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C., 182 F.3d 133, 141 (2d Cir. 1999) (quoting 15 U.S.C. § 1125(a)(1)(A)).

**Plaintiff's Entitlement to Relief**

567. Defendant used his association with Veza, Veza's commercial identity, and the goodwill arising from Defendant's association with Veza, specifically Veza's WAIO Trademark,

in promoting and building Defendant's separate paid coaching, consulting, advisory, and agency-related services. See Exhibit 24 – WAIO Trademark Application; Exhibit 5; Exhibit 6; Exhibit 7.

568. While working within Plaintiff's organization and under the ICA, Defendant developed and operated unauthorized ventures directed toward Webflow and digital agencies, including "Long Live Agencies" and "Kiya," through which Defendant offered paid coaching, consulting, advisory, and community services to agency owners. Exhibit 2; Exhibit 5; Exhibit 6; Exhibit 16.

569. Defendant's position with Plaintiff provided him direct access to Plaintiff's customers, prospects, acquisition targets, commercial processes, and proprietary materials. See Exhibit 2; Exhibit 3; Exhibit 4.

570. Plaintiff alleges that Defendant's use of his Veza affiliation, Veza associated communications, and Veza's commercial methods, specifically the Veza WAIO Trademark, in connection with Defendant's unauthorized competing services created confusion concerning Plaintiff's affiliation with, sponsorship of, or approval of Defendant's commercial activities. See Exhibit 24; Exhibit 5; Exhibit 6; Exhibit 7.

571. Defendant appropriated the benefit of Plaintiff's commercial identity and goodwill for his own competing ventures and impaired Plaintiff's ability to control the commercial use of its identity and reputation. See 15 U.S.C. § 1125(a)(1)(A); Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383–84 (2d Cir. 2005). See Exhibit 5; Exhibit 6; Exhibit 7.

572. Defendant affirmatively used his connection with Plaintiff to develop and promote his separate commercial activities. See Exhibit 5; Exhibit 6; Exhibit 7.

573. On or about October 20, 2025, Defendant entered into an Agency Academy Growth Program Coaching Agreement with Beqi. See Exhibit 5.

574. In the Agency Academy Growth Program Coaching Agreement with Beqi, Defendant includes, "Marketing Playbooks: Access to tested marketing systems used across Veza's portfolio." See Exhibit 5.

575. Defendant directly included Veza's proprietary information within Agency Academy Growth Program Coaching Agreement without Veza's authorization. See Exhibit 5; Exhibit 4.

576. On or about December 1, 2025, Defendant entered into an Agency Academy Growth Program Coaching Agreement with Fionn Lennon. See Exhibit 5.

577. In the Agency Academy Growth Program Coaching Agreement with Fionn Lennon, Defendant includes, "Marketing Playbooks: Access to proven marketing systems tactics currently used across Veza Digital and its portfolio of four agencies." See Exhibit 5.

578. Defendant directly included Veza's proprietary information within Agency Academy Growth Program Coaching Agreement without Veza's authorization. See Exhibit 5; Exhibit 4.

579. On or about September 26, 2025, Defendant used a Veza email address to invite Tim Garrison and Betsy Price of Gigantic into his private community of agency owners. Gigantic and its principals already existed within Plaintiff's CRM, and Defendant copied a Veza executive on the solicitation. See Exhibit 3; Exhibit 7.

580. Defendant further acknowledged that his position with Plaintiff provided him access to agency owners who could become customers of his separate unauthorized business. See Exhibit 6.

581. Defendant further associated his competing services with Plaintiff by representing to prospective customers that the methods and commercial processes he offered through his private

business were derived from, developed through, or used by Plaintiff. See Exhibit 6; Exhibit 4; Exhibit 20.

582. In multiple recorded sessions, Defendant expressly identified methods taught through his private coaching as processes used by Plaintiff. See Exhibit 6; Exhibit19; Exhibit 20.

583. On or about December 16, 2025, Defendant pitched James Whittall of Influx Digital, an entity already within Plaintiff's CRM, and described his six-week program as essentially the same process Plaintiff used after acquiring an agency. See Exhibit 3; Exhibit 20.

584. Defendant explained that Plaintiff used the process to increase acquired-agency revenue during approximately the first thirty (30) to sixty (60) days following acquisition and identified pricing as one of Plaintiff's primary post-acquisition revenue levers. See <u>Star Indus., Inc. v. Bacardi & Co. Ltd.</u>, 412 F.3d 373, 383–84 (2d Cir. 2005). See Exhibit 20.

585. Defendant similarly used Plaintiff's proprietary commercial offerings and methods in connection with services provided through Defendant's separate paid business. On or about December 18, 2025, Defendant taught Plaintiff's WAIO methodology and associated himself to Plaintiff's WAIO Trademark to an outside agency, including guarantee and rollover mechanics, and use in transitioning customers into continuing retainers. See Exhibit 4; Exhibit 19.

586. Defendant also offered to provide recordings of recent sales calls so that the outside agency could observe Defendant's sales process. See Exhibit 6; Exhibit 19.

587. Defendant subsequently disclosed Plaintiff's competitive pricing position, approximate labor-cost and markup model, outbound timing, valuation methods, acquisition information, and other internal commercial information during his paid coaching activities. See Exhibit 6; Exhibit 4; Exhibit 19.

588. Defendant's unauthorized services substantially overlapped with the commercial services, processes, and agency relationships Defendant accessed through Plaintiff. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6.

589. Defendant's unauthorized business included six (6) week coaching programs generally priced between approximately Five Thousand Dollars ($5,000) and Six Thousand Dollars ($6,000), consulting services at approximately Five Hundred Dollars ($500) per hour, fractional advisory engagements beginning at approximately Fifteen Thousand Dollars ($15,000) per month, and a paid agency-owner community. See Exhibit 16; Exhibit 5; Exhibit 6.

590. Defendant marketed those services to agency owners, including persons and businesses already present within Plaintiff's systems, while identifying Plaintiff's methods and processes as the basis for services Defendant was offering for his own financial benefit. See Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 16; Exhibit 20; Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).

591. Through Defendant's use of his Veza affiliation, Veza email account, Plaintiff's existing agency relationships, and Plaintiff-derived commercial methods to promote and provide Defendant's own paid services, Defendant created a likelihood that prospective customers would perceive Defendant's unauthorized ventures as a associated with Veza. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7; Exhibit 20. 15 U.S.C. § 1125(a)(1)(A)); Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).

592. Defendant's unauthorized business as affiliated or connected with Plaintiff, or as sponsored or approved by Plaintiff. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7;

Exhibit 20. 15 U.S.C. § 1125(a)(1)(A)); Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).

593. Defendant's conduct therefore caused and was likely to continue causing confusion regarding the relationship between Plaintiff and Defendant's separate commercial activities, resulting in injury to Plaintiff's goodwill, commercial relationships, and control over its commercial identity. See 15 U.S.C. § 1125(a)(1)(A); Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383–84 (2d Cir. 2005); See Exhibit 3; Exhibit 4; Exhibit 7; Exhibit 22.

**Causation and Damages**

594. As a direct and proximate result of Defendant's false association and false designation of origin, Plaintiffs have suffered injury to their goodwill, commercial identity, reputation, and existing and prospective business relationships, including harm arising from the likelihood that agency owners and prospective customers would perceive Defendant's separate commercial activities as affiliated with, sponsored by, or approved by Plaintiffs. See Exhibit 5; Exhibit 6; Exhibit 22; 15 U.S.C. § 1125(a)(1)(A); Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383–84 (2d Cir. 2005).

**Relief**

595. Plaintiffs are entitled to recover damages and appropriate equitable and injunctive relief necessary to prevent further false association, false designation of origin, or misleading representations concerning Defendant's affiliation, connection, sponsorship, or approval by Plaintiffs, together with such further relief available under the Lanham Act. See 15 U.S.C. § 1125(a)(1)(A); Exhibit 5; Exhibit 22; Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383–84 (2d Cir. 2005).

## FOURTEENTH CAUSE OF ACTION
## (False Advertising/ Commercial Misrepresentation)

596. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

### LEGAL STANDARD FOR FALSE ADVERTISING AND COMMERICAL MISREPRESENTATION UNDER THE LANHAM ACT

597. Section 43(a)(1)(B) of the Lanham Act imposes liability on any person who, in connection with goods or services, uses in commerce a "false or misleading description of fact, or false or misleading representation of fact" that, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin" of that person's or another person's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B); see Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 122 (2014).

598. To prevail on a false advertising claim under the Lanham Act, a plaintiff must establish that the challenged message is "(1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." Souza v. Exotic Island Enters., Inc., 68 F.4th 99, 118 (2d Cir. 2023) (quoting Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 65 (2d Cir. 2016)).

599. A plaintiff may establish falsity by demonstrating that the challenged advertisement is either literally false or, although not literally false, is likely to mislead or confuse consumers. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

600. When an advertisement is literally false, consumer deception is presumed and a court may grant relief without reference to the advertisement's actual impact on the buying public. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

601. An advertisement may be literally false even though it does not expressly make a false assertion where its words or images, considered in context, "necessarily imply a false message." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007).

602. Where an advertisement does not convey an unambiguous false message but is alleged to be misleading, the plaintiff must support its claim with extrinsic evidence of consumer deception or confusion. See Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

603. A false representation must be material to support a Lanham Act false advertising claim. See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 70–71 (2d Cir. 2016).

604. A false representation is material where the deception is "likely to influence purchasing decisions." See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 70–71 (2d Cir. 2016).

605. To constitute "commercial advertising or promotion" under the Lanham Act, a representation must be: (1) commercial speech; (2) made for the purpose of influencing consumers to purchase the defendant's goods or services; and (3) sufficiently disseminated to the relevant purchasing public. See Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir. 2004) (citing Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56, 57-58 (2d Cir. 2002)).

606. "Commercial advertising or promotion" is not limited to traditional advertising campaigns, but requires sufficient dissemination to the relevant purchasing public. See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56 (2d Cir. 2002).

607. The relevant inquiry is whether the representations are part of an organized campaign to penetrate the relevant market. Isolated disparaging statements are insufficient to

constitute "commercial advertising or promotion" under the Lanham Act. See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002).

608. A plaintiff bringing a false advertising claim under Section 1125(a) must allege an injury to a commercial interest in reputation or sales proximately caused by the defendant's misrepresentations. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 140 (2014).

609. A plaintiff ordinarily satisfies the proximate-cause requirement by showing that its economic or reputational injury flows directly from the deception caused by the defendant's advertising, including where the deception of consumers causes them to withhold trade from the plaintiff. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133 (2014).

**Plaintiff's Entitlement to Relief**

610. Defendant developed and operated separate paid coaching, consulting, advisory, and community businesses directed toward Webflow and digital agencies, including ventures operating under the names "Long Live Agencies" and "Kiya." See Exhibit 5; Exhibit 6.

611. Defendant marketed six (6) week coaching programs generally priced between approximately Five Thousand Dollars ($5,000) and Six Thousand Dollars ($6,000), consulting services at approximately Five Hundred Dollars ($500) per hour, fractional advisory engagements beginning at approximately Fifteen Thousand Dollars ($15,000) per month, and a paid agency-owner community with approximately thirty (30) to forty (40) members. See Exhibit 16; Exhibit 5; Exhibit 6.

612. Plaintiff alleges that Defendant made false or misleading representations concerning the nature, characteristics, qualities, and origin of Defendant's commercial services by marketing and selling Plaintiff's commercial processes, methods, and proprietary information,

specifically Veza's WAIO Trademark, as components of Defendant's own paid offerings. See Exhibit 5; Exhibit 6; Exhibit 4; Exhibit 19.

613. Plaintiff alleges that these representations injured Plaintiff's commercial interests, reputation, sales opportunities, and customer and prospective-customer relationships by enabling Defendant to compete for agency business using commercial methods and information belonging to Plaintiff. See 15 U.S.C. § 1125(a)(1)(B); Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133, 140 (2014).

614. Defendant's representations were made for the purpose of selling his separate commercial services to agency owners. See Exhibit 5; Exhibit 6; Exhibit 20.

615. On or about October 20, 2025, Defendant entered into an Agency Academy Growth Program Coaching Agreement with Beqi. See Exhibit 5.

616. In the Agency Academy Growth Program Coaching Agreement with Beqi, Defendant includes, "Marketing Playbooks: Access to tested marketing systems used across Veza's portfolio." See Exhibit 5.

617. Defendant directly included Veza's proprietary information within Agency Academy Growth Program Coaching Agreement without Veza's authorization. See Exhibit 5; Exhibit 4.

618. On or about December 1, 2025, Defendant entered into an Agency Academy Growth Program Coaching Agreement with Fionn Lennon. See Exhibit 5.

619. In the Agency Academy Growth Program Coaching Agreement with Fionn Lennon, Defendant includes, "Marketing Playbooks: Access to proven marketing systems tactics currently used across Veza Digital and its portfolio of four agencies." See Exhibit 5.

620. Defendant directly included Veza's proprietary information within Agency Academy Growth Program Coaching Agreement without Veza's authorization. See Exhibit 5; Exhibit 4.

621. In multiple recorded sessions, Defendant expressly identified methods he was teaching through his private coaching as processes used by Plaintiff. See Exhibit 6; Exhibit 19; Exhibit 20.

622. Defendant acknowledged that his position with Plaintiff provided him access to agency owners who could become customers of his separate business and explained that he learned about those businesses through his role with Plaintiff before offering consulting services to them. See Exhibit 3; Exhibit 4; Exhibit 6.

623. Defendant further described converting insights gained from his role with Plaintiff into his six (6) week paid program. See Exhibit 6.

624. On or about December 16, 2025, Defendant pitched his six (6) week paid program to James Whittall of Influx Digital, an entity already within Plaintiff's CRM. See Exhibit 3; Exhibit 20.

625. In promoting that program, Defendant described it as essentially the same process Plaintiff used after acquiring an agency and explained that Plaintiff used the process to increase acquired-agency revenue during approximately the first thirty (30) to sixty (60) days following acquisition. See Exhibit 20.

626. Defendant identified pricing as one of Plaintiff's primary post-acquisition revenue levers and represented that material immediate revenue improvement could be achieved through pricing changes. See Exhibit 20.

627. Defendant similarly promoted and provided his paid services using Plaintiff's existing commercial offerings and proprietary information. See Exhibit 6; Exhibit 4; Exhibit 19.

628. On or about December 18, 2025, Defendant taught Plaintiff's WAIO Trademark to Velinovic, including the approximate price of the offer, its guarantee and rollover mechanics, and Plaintiff's use of the offering to transition customers into continuing retainers. See Exhibit 4; Exhibit 19.

629. Defendant also offered to provide recordings of recent sales calls so Velinovic could observe Defendant's sales process. See Exhibit 6; Exhibit 19.

630. On December 22, 2025, Defendant disclosed Plaintiff's competitive pricing position relative to three named competitors, approximate labor-cost and markup model, outbound timing, and a valuation scorecard used in Plaintiff's processes. See Exhibit 6; Exhibit 4.

631. Defendant's use of Plaintiff-derived methods and information was not confined to a single agency or isolated interaction. Defendant entered into coaching arrangements involving Kreshnik Beqi, Mateja Velinovic, Fionn Lennon, and other agency owners, operated a paid community containing approximately thirty (30) to forty (40) members, and solicited persons already present within Plaintiff's systems. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 23.

632. Defendant used his Veza company email account in connection with onboarding Joe Crabtree and Joe Murray of Phunk Creative into Defendant's unauthorized Long Live Agencies, despite Phunk Creative being a Plaintiff M&A prospect associated with a transaction opportunity managed by Defendant. See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 56–58 (2d Cir. 2002). See Exhibit 3; Exhibit 4; Exhibit 7.

633. Defendant continued using Plaintiff-developed commercial products in connection with his unauthorized services. See Exhibit 6; Exhibit 4; Exhibit 18.

634. On or about April 29, 2026, Defendant conducted an MCP Readiness Audit for beqi.co that was accompanied by a proposed implementation priced between approximately Twenty-Five Thousand Dollars ($25,000) and Fifty Thousand Dollars ($50,000). See Exhibit 18.

635. Defendant identified the MCP/AEO audit framework as a Plaintiff-developed commercial product, and recordings reflect Defendant describing Veza's WAIO Trademark as being built or tested through Veza for broader use across Veza agencies. See Exhibit 18.

636. Defendant's representations concerning the source, nature, and qualities of the commercial methods and services he offered were material to the agency owners Defendant sought to convert into paying customers because those representations identified Plaintiff's actual commercial processes and results as the basis for Defendant's competing paid offerings. See Exhibit 6; Exhibit 4; Exhibit 20.

637. Defendant received payments associated with these unauthorized commercial ventures, including a Five Thousand Dollar ($5,000) payment associated with Kreshnik Beqi, multiple Stripe payments and payouts associated with Kiya, and payments associated with Shadow Realm, LLC. See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 70–71 (2d Cir. 2016). See Exhibit 16; Exhibit 5

**Causation and Damages**

638. As a direct and proximate result of Defendant's false or misleading commercial representations, Plaintiffs have suffered injury to their commercial interests, reputation, sales opportunities, and existing and prospective customer relationships, while Defendant obtained or sought commercial benefit by marketing competing services using Plaintiffs' commercial methods

and information. See Exhibit 5; Exhibit 6; Exhibit 22; Exhibit 20; Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133, 140 (2014).

**Relief**

639. Plaintiffs are entitled to recover damages and appropriate equitable and injunctive relief for Defendant's false or misleading commercial representations, including relief necessary to prevent further misrepresentations concerning the source, nature, characteristics, or qualities of Defendant's competing commercial services, together with such further relief available under the Lanham Act. See 15 U.S.C. § 1125(a)(1)(B); Exhibit 5; Exhibit 22; Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 140 (2014).

## FIFTEENTH CAUSE OF ACTION
**(Specific Performance/ Injunctive Relief)**

640. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR SPECIFIC PERFORMANCE/INJUNCTIVE RELIEF**

641. "The decision whether or not to award specific performance is one that rests in the sound discretion of the trial court." Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 415 (2001).

642. Specific performance is an equitable remedy committed to the discretion of the Court. DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 345 (S.D.N.Y. 2009).

643. Specific performance is appropriate where "(1) the contract is valid, (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations, (3) defendant is able to perform its obligations, and (4) plaintiff has no adequate remedy at law." DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 345 (S.D.N.Y. 2009) (quoting Travellers Int'l AG v. Trans World Airlines, Inc., 722 F. Supp. 1087, 1104 (S.D.N.Y. 1989)).

644. Before the "extraordinary" equitable remedy of specific performance may be ordered, "the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice." BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC, 669 F. Supp. 3d 204, 257 (S.D.N.Y. 2023) (quoting Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 262 (2d Cir. 2002)).

645. Specific performance will not be ordered where money damages adequately protect the injured party's contractual expectation, but equitable relief may be appropriate where damages are difficult to prove with certainty, substitute performance cannot readily be obtained, or the subject matter is unique. See La Mirada Prods. Co. v. Wassall PLC, 823 F. Supp. 138, 140–41 (S.D.N.Y. 1993).

646. Injunctive relief likewise may be inappropriate where monetary damages provide an adequate remedy at law. See Litho Prestige, Div. of Unimedia Grp., Inc. v. News Am. Publ'g, Inc., 652 F. Supp. 804, 809–10 (S.D.N.Y. 1986).

**Plaintiffs' Entitlement to Relief**

647. The third parties and transactions identified herein are pleaded as specific examples of Defendant's misconduct and are not intended to limit Plaintiffs' proof of additional breaches, damages, or improper conduct discovered or developed in this action.

648. Plaintiff and Defendant are parties to valid and binding agreements governing Defendant's obligations to Plaintiffs. See Exhibit 2; Exhibit 12; Exhibit 1; Exhibit 13.

649. On November 25, 2024, Defendant and Shadow Digital entered into the APA with Plaintiff for the sale of Shadow Digital for consideration of approximately One Million Eight Hundred and Seventy Thousand Dollars ($1,870,000), and Defendant signed the APA both on behalf of Shadow Digital and personally as an Owner. See Exhibit 1.

650. Defendant subsequently entered into the ICA with Plaintiff, effective January 1, 2026, under which Defendant served as Plaintiffs' Chief Growth Officer. See DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 345 (S.D.N.Y. 2009).

651. Plaintiffs allege that Defendant's continuing violations of his contractual obligations have injured and continue to injure Plaintiff through the unauthorized use, disclosure, and retention of Plaintiffs' confidential and proprietary information, interference with Plaintiffs' protected business relationships, and pursuit of competing commercial activities using Plaintiffs' information and relationships.

652. Monetary damages alone cannot adequately protect Plaintiff from the continuing use or disclosure of its confidential information or restore Plaintiffs' control over its protected commercial information and business relationships. See BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC, 669 F. Supp. 3d 204, 257 (S.D.N.Y. 2023); La Mirada Prods. Co. v. Wassall PLC, 823 F. Supp. 138, 140–41 (S.D.N.Y. 1993).

653. The ICA requires Defendant to protect Plaintiffs' Confidential Information, restricts his use and disclosure of Company Information and Confidential Information to Plaintiff-approved uses, requires the return of Company information and materials upon termination, and restricts Defendant's use of Plaintiffs' work product, proprietary information, Company technology, and confidential know-how.

654. The ICA contains a twenty-four (24) month post-termination non-solicitation covenant concerning specified Plaintiff customers, potential customers, employees, and contractors and restricts competitive activity to the extent Plaintiffs' Confidential Information is used.

655. Notwithstanding these obligations, Defendant used Plaintiffs' relationships and proprietary information in connection with his unauthorized commercial ventures. See Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7.

656. Defendant solicited persons already present within Plaintiffs' systems, disclosed Plaintiffs' acquisition information, pricing, sales methods, labor models, valuation methods, and other internal commercial information during paid coaching calls, and offered Company sales-call recordings to an outside agency paying him for coaching. See Exhibit 3; Exhibit 4; Exhibit 6; Exhibit 7; Exhibit 19.

657. Defendant's conduct creates an ongoing risk concerning Plaintiffs' confidential and proprietary information.

658. During the Cure Period, Plaintiffs' audit records reflected substantial data-export activity associated with Defendant's Company Google Workspace account. See Exhibit 17.

659. On or about July 13, 2026, a Google Takeout was initiated from Defendant's Veza account selecting approximately sixty (60) Google products, and the resulting archive contained approximately One Hundred Thirty-Eight Thousand Five Hundred and Thirty-Two (138,532) Gmail messages and Four Hundred and Sixty-Nine (469) Drive files totaling approximately 19.22 gigabytes.

660. Plaintiffs' audit records further identified thousands of distinct files associated with download, copy, or synchronization activity and hundreds of external sharing grants to addresses outside Plaintiffs' tenant domains. See Exhibit 17.

661. The information accessed, downloaded, retained, or made accessible included Plaintiffs' acquisition-target spreadsheet, deal models, acquisition-target financial information, Digital Audit Questionnaire template, transaction templates, client briefs, project plans, migration

materials, M&A information, sales materials, call artifacts, and other commercial records. See Exhibit 17; Exhibit 4

662. Following Defendant's termination, Plaintiff expressly directed Defendant to return Company information and property, preserve records, and comply with the contractual obligations under the APA and ICA that survived termination. See Exhibit 9.

663. Defendant continued pursuing agency consulting and M&A related services after Plaintiff directed him to cease work and comply with his surviving contractual obligations. See Exhibit 5; Exhibit 6; Exhibit 7; Exhibit 9.

664. On July 15, 2026, Defendant conducted a follow-up sales call with Digidop, an active Plaintiff M&A and strategic-partnership prospect that Defendant had personally helped develop for Plaintiff, and attempted to sell his own approximately Seven Thousand Five Hundred Dollars ($7,500) "Sellable Roadmap" program. See Exhibit 10; Exhibit 11.

665. In August 2026, Defendant continued discussing or pursuing agency consulting and M&A-related services with outside parties while acknowledging that he believed restrictive obligations arising from his relationship with Plaintiff remained in effect. See Exhibit 5; Exhibit 6; Exhibit 7.

666. Plaintiffs have performed their obligations under the agreements and remain willing and able to perform any remaining obligations required of them.

667. Defendant remains capable of complying with his surviving contractual obligations, including by returning Plaintiffs' information and property, refraining from using or disclosing Plaintiffs' confidential and proprietary information, preserving relevant records, and complying with enforceable restrictions governing protected business relationships and competitive activity.

668. Plaintiffs seek specific performance and injunctive relief because continuing misuse or disclosure of confidential information and interference with protected commercial relationships cannot be fully remedied through an award of money damages after the fact.

**Causation and Damages**

669. Defendant's continuing or threatened use, disclosure, or retention of Plaintiffs' confidential and proprietary information, and his interference with protected commercial relationships, threatens harm that cannot be fully measured or remedied through monetary damages alone, including loss of confidentiality, loss of control over proprietary information, and continuing impairment of protected goodwill and business relationships. See Exhibit 2; Exhibit 17; Exhibit 9; Exhibit 22; BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC, 669 F. Supp. 3d 204, 257 (S.D.N.Y. 2023); La Mirada Prods. Co. v. Wassall PLC, 823 F. Supp. 138, 140–41 (S.D.N.Y. 1993).

**Relief**

670. Plaintiffs are entitled to appropriate specific performance and injunctive relief requiring Defendant to comply with enforceable surviving obligations under the governing agreements, including obligations concerning return and non-use of Plaintiffs' confidential and proprietary information and applicable restrictions protecting Plaintiffs' commercial relationships, because monetary damages alone are inadequate to prevent the continuing harm alleged. See Exhibit 2; Exhibit 9; Exhibit 1; DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 345 (S.D.N.Y. 2009); BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC, 669 F. Supp. 3d 204, 257 (S.D.N.Y. 2023).

**SIXTEENTH CAUSE OF ACTION**
**(Declaratory Judgment - No Further Profit Participation Rights)**

671. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR DECLARATORY JUDGMENT - NO FURTHER PROFIT PARTICIPATION RIGHTS**

672. The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

673. Declaratory relief is a procedural device through which substantive claims may be vindicated. See Luckenbach S.S. Co. v. United States, 312 F.2d 545, 548 (2d Cir. 1963).

674. An "actual controversy" exists where, under all the circumstances, there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

675. The standard for ripeness in a declaratory judgment action similarly requires a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant declaratory relief. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005).

676. Whether to exercise jurisdiction over a declaratory judgment action is committed to the district court's discretion. In determining whether to entertain such an action, courts consider: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether the judgment would finalize the controversy and offer relief from

uncertainty. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

677. To establish that a party has "No Further Profit Participation Rights" in a contract the party asserting this must prove that the clear, unambiguous, and integrated terms of the governing contract do not grant, or have extinguished, any such rights. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002).

678. In the Southern District of New York, a court will apply ordinary principles of contract interpretation to determine the intent of the parties. See Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000).

679. Whether Defendant retains any further profit-participation rights is determined by the terms of the governing Profit Participation Agreement, including its termination, forfeiture, and reconciliation provisions.

**Plaintiffs' Entitlement to Relief**

680. Plaintiffs and Defendant entered into the Profit Participation Agreement (the "PPA"), effective January 1, 2026, which governed Defendant's contractual right to participate in Plaintiffs' profit-sharing arrangement subject to the conditions, limitations, reconciliation provisions, and termination provisions stated therein. See Exhibit 12.

681. Section 1.7 of the PPA provides that, upon termination of Defendant's engagement pursuant to the Independent Contractor Agreement for any reason, Defendant forfeits his rights to participate in the profit-sharing plan, including rights to unearned, unpaid, or future profit allocations, and no additional Profit Share accrues or becomes payable after the effective date of termination. See Exhibit 12.

682. Plaintiffs terminated Defendant for Cause by written notice dated July 15, 2026, with Defendant's termination becoming effective August 15, 2026. See Exhibit 9; Exhibit 2.

683. Accordingly, as of August 15, 2026, Defendant ceased possessing any contractual right to accrue additional Profit Share or participate prospectively in Plaintiffs' profit-sharing plan, and any determination concerning amounts arising before termination remains subject to the PPA's accounting, reconciliation, forfeiture, and repayment provisions. See Exhibit 12; Exhibit 16.

684. An actual controversy exists concerning whether Defendant possesses any continuing, future, post-termination, or additional profit-participation rights under the PPA.

685. Plaintiffs are entitled to a declaration that, effective August 15, 2026, Defendant forfeited his right to participate further in Plaintiffs' profit-sharing plan and has no right to additional, future, or post-termination Profit Share except to the extent any amount is expressly determined to have survived termination under the PPA's governing terms.

**Causation**

686. As a result of Defendant's termination for Cause effective August 15, 2026, the PPA's termination and forfeiture provisions were triggered, extinguishing Defendant's right to accrue additional Profit Share or participate prospectively in Plaintiffs' profit-sharing plan. An actual controversy exists between the parties concerning whether Defendant retains any continuing, future, post-termination, or additional profit-participation rights under the PPA.

**Relief**

687. Plaintiffs are entitled to a declaration that, effective August 15, 2026, Defendant forfeited his right to participate further in Plaintiffs' profit-sharing plan and has no right to additional, future, or post-termination Profit Share, except to the extent any amount is expressly determined to have survived termination under the PPA's governing terms.

## SEVENTEENTH CAUSE OF ACTION
**(Declaratory Judgment - Defendant was a Contractor, Not an Employee)**

688. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

### LEGAL STANDARD FOR DECLARATORY JUDGMENT - DEFENDANT WAS A CONTRACTOR, NOT AN EMPLOYEE

689. The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

690. Declaratory relief is a procedural device through which substantive claims may be vindicated. See Luckenbach S.S. Co. v. United States, 312 F.2d 545, 548 (2d Cir. 1963).

691. An "actual controversy" exists where, under all the circumstances, there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

692. The standard for ripeness in a declaratory judgment action similarly requires a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant declaratory relief. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005).

693. Whether to exercise jurisdiction over a declaratory judgment action is committed to the district court's discretion. In determining whether to entertain such an action, courts consider: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether the judgment would finalize the controversy and offer relief from

uncertainty. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

694. Whether Defendant was an independent contractor or an employee is determined by the governing legal standard for worker classification, applied to the parties' agreement and the circumstances of Defendant's engagement.

695. The determination of independent contractor or an employee is a legal conclusion to be drawn from a question of a fact.

696. Under New York law the court distinction between an employee and an independent contractor depends on the statutory or common law context of the claim.

697. Generally, an independent contractor agrees to achieve a certain result but is not subject to the employer's control over the means used to achieve that result. Palmer v. City of Yonkers, 22 F. Supp. 2d 283 (S.D.N.Y. 1998).

698. In contrast, an employee accepts the directions of the employer regarding both the result and the manner and means by which the work is to be done. Palmer v. City of Yonkers, 22 F. Supp. 2d 283 (S.D.N.Y. 1998).

**Plaintiffs' Entitlement to Relief**

699. Plaintiffs and Defendant entered into the Independent Contractor Agreement effective January 1, 2026, which expressly identifies Defendant as the "Contractor" and provides that Defendant would perform services independently and not as an employee of Plaintiffs. See Exhibit 2, §§ 1.1–1.2.

700. The Declaratory Judgment Act permits the Court to declare the parties' respective legal relations where an actual controversy exists concerning the nature of their contractual

relationship. See 28 U.S.C. § 2201(a); Luckenbach S.S. Co. v. United States, 312 F.2d 545, 548 (2d Cir. 1963).

701. The Independent Contractor Agreement repeatedly and expressly disclaims an employer-employee relationship. See Exhibit 2, §§ 1.1–1.2.

702. Section 5.1 provides that Defendant entered into and would remain under the Agreement as an independent contractor, would not become an employee of Plaintiffs, and would not be entitled to employment benefits afforded to Plaintiffs' employees. See Exhibit 2.

703. The parties' compensation and financial arrangements further reflected the independent-contractor relationship established by the Agreement. See Exhibit 2; Exhibit 16; Exhibit 12.

704. Defendant was responsible for taxes arising from compensation paid for his services and, under the Agreement, was not entitled to employee benefits such as unemployment insurance, workers' compensation, medical or life insurance, sick leave, overtime, retirement benefits, vacation time, or similar employment benefits. See Exhibit 2; Exhibit 16.

705. The parties also structured Defendant's authority consistently with the contractual relationship they selected.

706. The Independent Contractor Agreement provides that Defendant lacked authority merely by virtue of his engagement to represent himself as an employee, bind Plaintiffs contractually, or represent Plaintiffs before governmental or regulatory authorities absent express written authorization. See Exhibit 2.

707. The parties' written agreement therefore establishes a contractual relationship materially different from an ordinary employer-employee relationship. See Exhibit 2.

708. An actual controversy exists concerning the legal characterization of Defendant's relationship with Plaintiffs and the rights and obligations arising from that relationship. See Exhibit 2; Exhibit 16.

709. That controversy is sufficiently immediate and concrete because Defendant's status bears directly upon the parties' continuing contractual rights and liabilities arising from his engagement and termination. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007); Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005).

710. A declaration concerning Defendant's status will serve a useful purpose by clarifying the legal relationship created by the Independent Contractor Agreement and resolving uncertainty concerning whether rights or liabilities dependent upon employee status may properly be asserted. See Exhibit 2; Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 389 (2d Cir. 2005).

711. Plaintiffs seek a declaration that Defendant performed services for Plaintiffs as an independent contractor, and not as an employee, during the period governed by the Independent Contractor Agreement. See 28 U.S.C. § 2201(a); Exhibit 2.

**Causation and Damages**

712. As a direct result of the parties' dispute concerning Defendant's legal status, Plaintiffs face uncertainty regarding the nature and extent of rights, obligations, and potential liabilities arising from Defendant's engagement. See Exhibit 2; Exhibit 16. Declaratory relief will resolve that uncertainty before further liabilities or disputes accrue. See Luckenbach S.S. Co. v. United States, 312 F.2d 548 (2d Cir. 1963); Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 389 (2d Cir. 2005).

**Relief**

713. Plaintiffs are entitled to a declaration that Defendant's relationship with Plaintiffs under the Independent Contractor Agreement was that of an independent contractor rather than an employee, and that the parties' rights and obligations arising from that engagement are governed accordingly. See 28 U.S.C. § 2201(a); Exhibit 2; Exhibit 16; See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

**EIGHTEENTH CAUSE OF ACTION**
**(Declaratory Judgment - Enforcement of SAFE Rights)**

714. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR DECLARATORY JUDGMENT - ENFORCEMENT OF SAFE RIGHTS**

715. The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

716. Declaratory relief is a procedural device through which substantive claims may be vindicated. See Luckenbach S.S. Co. v. United States, 312 F.2d 545, 548 (2d Cir. 1963).

717. An "actual controversy" exists where, under all the circumstances, there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

718. The standard for ripeness in a declaratory judgment action similarly requires a substantial controversy between parties having adverse legal interests of sufficient immediacy and

reality to warrant declaratory relief. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005).

719. Whether to exercise jurisdiction over a declaratory judgment action is committed to the district court's discretion. In determining whether to entertain such an action, courts consider: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether the judgment would finalize the controversy and offer relief from uncertainty. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

720. Under Delaware law, courts interpret contracts objectively and give effect to the parties' intentions as reflected in the four corners of the agreement. See In re Viking Pump, Inc., 148 A.3d 633, 648 (Del. 2016).

721. Where contractual language is clear and unambiguous, the agreement is construed as a whole and each provision is given effect according to its plain meaning. See In re Viking Pump, Inc., 148 A.3d 633, 648 (Del. 2016); Manti Holdings, LLC v. Authentix Acquisition Co., 261 A.3d 1199, 1208 (Del. 2021).

722. A contract is not ambiguous merely because the parties disagree concerning its interpretation. See Manti Holdings, LLC v. Authentix Acquisition Co., 261 A.3d 1199, 1208 (Del. 2021).

723. Contractual language is ambiguous only where the disputed provisions are reasonably susceptible to more than one interpretation; if the language is unambiguous, the Court enforces the parties' agreement according to its terms. See Manti Holdings, LLC v. Authentix Acquisition Co., 261 A.3d 1199, 1208 (Del. 2021); Salamone v. Gorman, 106 A.3d 354, 374 (Del. 2014).

**Plaintiffs' Entitlement to Relief**

724. Schedule 1.4, § 2(a) of the APA provides that if, before the Twenty-Four (24) month anniversary of closing, an Owner voluntarily resigns as a service provider to Buyer or its affiliates, other than due to death or disability, or is terminated by Buyer or its affiliates for Cause, each payment due to Seller under that provision is reduced by Fifty (50) percent. See Exhibit 1, Schedule 1.4, § 2(a).

725. Defendant was terminated for Cause effective August 15, 2026, before the Twenty-Four (24) month anniversary of closing. See Exhibit 9; Exhibit 1.

726. On August 14, 2026, effective August 15, 2026, Plaintiff issued a SAFE Adjustment Notice applying the Business Adjustment provided for in Schedule 1.4, § 2(a). See Exhibit 15; Exhibit 1, Schedule 1.4, § 2(a).

727. Based upon Defendant's termination for Cause within the applicable twenty-four-month period, Plaintiff reduced the relevant payment from Seven Hundred and Fifty Thousand Dollars ($750,000) to Three Hundred and Seventy-Five Thousand Dollars ($375,000) in accordance with the Fifty (50) percent adjustment provided for by the APA. See Exhibit 14; Exhibit 15; Exhibit 1, Schedule 1.4, § 2(a).

728. Plaintiff thereby applied the adjustment mechanism according to the circumstances expressly identified in the parties' agreement. See In re Viking Pump, Inc., 148 A.3d 633, 648 (Del. 2016); Manti Holdings, LLC v. Authentix Acquisition Co., 261 A.3d 1199, 1208 (Del. 2021). See Exhibit 14; Exhibit 15; Exhibit 1, Schedule 1.4, § 2(a).

729. The SAFE Adjustment Notice did not amend, modify, revalue, convert, or terminate the SAFE itself. See Exhibit 14; Exhibit 15.

730. Plaintiff exercised its adjustment rights under the APA while leaving the SAFE's other terms, including its conversion mechanics, valuation terms, rollover interests, liquidity-event treatment, and other rights and obligations, unchanged and in full force and effect. See Exhibit 14; Exhibit 15.

731. Accordingly, Plaintiff is entitled to a declaration that the Business Adjustment was validly applied following Defendant's termination for Cause, that the relevant payment was properly reduced from Seven Hundred and Fifty Thousand Dollars ($750,000) to Three Hundred and Seventy-Five Thousand Dollars ($375,000), that the SAFE otherwise remains unchanged. See Exhibit 14; Exhibit 15.

732. Plaintiff seeks a declaration confirming the validity and enforceability of those adjustments and the parties' respective rights and obligations following their application.

733. Such relief would resolve the parties' present dispute concerning these adjustment mechanisms and establish their respective continuing rights and payment obligations under the parties' agreements. See 28 U.S.C. § 2201(a); Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388–89 (2d Cir. 2005).

**Causation**

734. As a result of Defendant's termination for Cause within the applicable twenty-four (24) month period, Plaintiffs exercised the Business Adjustment provided for under the APA. An actual controversy exists concerning Plaintiffs' right to enforce that adjustment and the continuing effect of the SAFE following the adjustment. Declaratory relief will resolve the parties' respective rights and obligations concerning the adjusted payment and the remaining terms of the SAFE.

**Relief**

735. Plaintiffs are entitled to a declaration that the Business Adjustment was validly exercised pursuant to the APA, reducing the applicable payment from Seven Hundred and Fifty Thousand Dollars ($750,000) to Three Hundred and Seventy-Five Thousand Dollars ($375,000), and that the adjustment did not amend, modify, revalue, convert, or terminate the SAFE, whose remaining terms continue in full force and effect.

**NINETEENTH CAUSE OF ACTION**
**(Declaratory Judgment – No Breach or Default Under Seller Note; Recalibration, Subordination, Offset, and No Improper Acceleration)**

736. Plaintiffs repeat and re-allege each of the allegations in the paragraphs above as though fully set forth herein.

**LEGAL STANDARD FOR DECLARATORY JUDGMENT – NO BREACH OR DEFAULT UNDER SELLER NOTE; RECALIBIRATION SUBORDINATION, OFFSET, AND NO IMPROPER ACCLERATION**

737. The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

738. Declaratory relief is a procedural device through which substantive claims may be vindicated. See Luckenbach S.S. Co. v. United States, 312 F.2d 545, 548 (2d Cir. 1963).

739. An "actual controversy" exists where, under all the circumstances, there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

740. The standard for ripeness in a declaratory judgment action similarly requires a substantial controversy between parties having adverse legal interests of sufficient immediacy and

reality to warrant declaratory relief. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005).

741. Whether to exercise jurisdiction over a declaratory judgment action is committed to the district court's discretion. In determining whether to entertain such an action, courts consider: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether the judgment would finalize the controversy and offer relief from uncertainty. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

742. Whether Plaintiffs are in breach or default under the Seller Note, and whether recalibration, subordination, offset, or acceleration rights apply, is determined by the terms of the Amended Seller Note and the related transaction documents.

743. Under Delaware law, courts interpret contracts objectively and give effect to the parties' intentions as reflected in the four corners of the agreement. Where contractual language is clear and unambiguous, the agreement is construed as a whole and each provision is given effect according to its plain meaning. See In re Viking Pump, Inc., 148 A.3d 633, 648 (Del. 2016); Manti Holdings, LLC v. Authentix Acquisition Co., 261 A.3d 1199, 1208 (Del. 2021).

744. A contract is not ambiguous merely because the parties disagree concerning its interpretation. Rather, contractual language is ambiguous only where the disputed provisions are reasonably susceptible to more than one interpretation; if the language is unambiguous, the Court enforces the parties' agreement according to its terms. See Manti Holdings, LLC v. Authentix Acquisition Co., 261 A.3d 1199, 1208 (Del. 2021); Salamone v. Gorman, 106 A.3d 354, 374 (Del. 2014).

**Plaintiffs' Entitlement to Relief**

745. Plaintiffs and the applicable Shadow Digital payee are parties to the Amended Seller Note, which governs Veza Shadow, LLC's deferred purchase-price obligations arising from the Shadow Digital transaction and incorporates the Seller Note recalibration provisions of the Asset Purchase and Contribution Agreement. See Exhibit 13; Exhibit 1.

746. The parties' APA established contractual mechanisms governing the consideration payable in connection with Plaintiffs' acquisition of Shadow Digital's assets, including the Business Adjustment set forth in Schedule 1.4, § 2(a), and the performance-based recalibration of the Seller Note. See Exhibit 1, Schedule 1.4, § 2(a) and § 1.4(e); Exhibit 13, § 1.4.

747. These adjustment mechanisms formed part of the consideration structure agreed upon by the parties in connection with Plaintiffs' acquisition of Shadow Digital. See Exhibit 1, § 1.4(e) and Schedule 1.4, § 2(a); Exhibit 13, § 1.4.

748. Plaintiffs allege that an actual and substantial controversy exists concerning Plaintiffs' contractual right to apply the Business Adjustment and recalibrate the Seller Note pursuant to the parties' agreements, and the resulting amounts payable following those adjustments.

749. Plaintiff seeks a declaration confirming the validity and enforceability of those adjustments and the parties' respective rights and obligations following their application.

750. An actual controversy exists because Defendant and/or the applicable Lorenz-controlled payee has asserted or may assert that Plaintiffs failed to satisfy amounts allegedly due under the Seller Note, while Plaintiffs contend that they have complied with their payment obligations and that any remaining disputed amounts are subject to the Amended Note's

recalibration, subordination, offset, notice, and cure provisions. See Exhibit 21; MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

751. Plaintiffs have paid all undisputed amounts presently due under the Amended Seller Note, and amounts presently disputed have been preserved pending resolution of the parties' competing contractual positions. See Exhibit 21.

752. Plaintiffs are not required to expose themselves to an asserted default or acceleration before seeking a declaration concerning their contractual obligations. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 128-31 (2007); Luckenbach S.S. Co. v. United States, 312 F.2d 545, 548 (2d Cir. 1963).

753. The Amended Seller Note does not permit Defendant or the applicable payee to disregard the contractual mechanisms governing the amount and enforceability of the obligation.

754. The Amended Note expressly incorporates performance-based recalibration and also subjects enforcement to applicable default, cure, and subordination provisions. See Exhibit 13; Exhibit 1; Exhibit 21.

755. The parties' agreements separately provided for a performance-based adjustment to the Seller Note, which constituted another component of the consideration payable in connection with Plaintiffs' acquisition of Shadow Digital's assets. See Exhibit 1, § 1.4(e); Exhibit 13, § 1.4.

756. Beginning six (6) months after the Closing Date, and every three (3) months thereafter, the Seller Note could be recalibrated based upon the acquired business's actual Net Operating Profit compared to its 2024 baseline Net Operating Profit.

757. If actual average Net Operating Profit met or exceeded the 2024 baseline, Seller Note payments would remain unchanged. See Exhibit 1, § 1.4(e)(i)(A).

758. If actual average Net Operating Profit fell below the baseline, the monthly payments could be proportionately adjusted to reflect the decrease. See Exhibit 1, § 1.4(e)(i)(B).

759. The APA further permitted Plaintiffs to reassess and recalibrate the remaining Seller Note balance using updated financial metrics, with the 2024 baseline serving as the primary reference point. See Exhibit 1, § 1.4(e)(ii); Exhibit 13, § 1.4.

760. Plaintiffs previously reserved and communicated their position concerning recalibration rights and did not waive those rights. See Exhibit 21.

761. On April 13, 2026, Plaintiff issued a Notice of Recalibration and Amendment to the Seller Note exercising its contractual adjustment rights based upon updated financial performance. See Exhibit 21.

762. The Notice compared actual Net Operating Profit for the trailing twelve (12) months ending March 31, 2026, against the 2024 Baseline Net Operating Profit.

763. The 2024 Baseline Net Operating Profit was Six Hundred and Twenty-One Thousand Seven Hundred and Seventy-Three Dollars ($621,773), while actual Net Operating Profit for the applicable twelve (12) month period was Four Hundred and Eight Thousand Two Hundred and Fifty-Four Dollars and Thirteen Cents ($408,254.13).

764. Applying the contractual adjustment mechanism, Plaintiff divided the actual Net Operating Profit of Four Hundred and Eight Thousand Two Hundred and Fifty-Four Dollars and Thirteen Cents ($408,254.13) by the baseline Net Operating Profit of Six Hundred and Twenty-One Thousand Seven Hundred and Seventy-Three Dollars ($621,773), resulting in a performance factor of 65.66% and a corresponding shortfall of 34.34%.

765. Plaintiff then applied the corresponding 34.34% shortfall to the post-NWC adjusted initial principal balance of the Amended Seller Note, prior to accounting for any additional Seller

payments, reducing that principal balance from approximately Four Hundred Sixty-Five Thousand Dollars ($465,000) to approximately Three Hundred Thousand Dollars ($300,000), as reflected in the amended recalibration notice. See Exhibit 13; Exhibit 21.

766. Plaintiff applied the contractual Business Adjustment by reducing the post-NWC adjusted initial principal balance of the Amended Seller Note by 34.34%, prior to accounting for additional Seller payments, resulting in an adjusted principal balance of approximately Four Hundred Sixty-Five Thousand Dollars ($465,000) and a recalibrated balance of approximately Three Hundred Thousand Dollars ($300,000), as reflected in the amended recalibration notice. Plaintiff therefore recalibrated the Seller Note proportionately based upon the acquired business's performance relative to the contractual baseline.

767. The parties' agreements separately provided for a performance-based adjustment to the Seller Note, which constituted another component of the consideration payable in connection with Plaintiffs' acquisition of Shadow Digital's assets. See Exhibit 1, § 1.4(e); Exhibit 13, § 1.4.

768. Plaintiffs' application of the Business Adjustment and Seller Note recalibration reflects the adjustment mechanisms provided for by the parties' agreements and the financial and termination circumstances triggering those provisions.

769. The parties' disagreement concerning the resulting payment obligations does not itself render the contractual provisions ambiguous, and the parties' respective rights are determined according to the terms of their agreements read as a whole. See Manti Holdings, LLC v. Authentix Acquisition Co., 261 A.3d 1199, 1208 (Del. 2021); Salamone v. Gorman, 106 A.3d 354, 374 (Del. 2014).

770. In full force and effect according to its terms, and that Plaintiff validly recalibrated the Seller Note principal balance from Seven Hundred and Sixty-Five Thousand Five Hundred and

Fifty-Eight Dollars and Twenty-Seven Cents ($765,558.27) Four Hundred and Sixty-Five Thousand One Hundred Twenty Two Dollars and Ninety One Cents ($465,122.91) pursuant to the contractual performance-based adjustment mechanism.

771. The recalibration reflected a principal write-down of Three Hundred Thousand and Four Hundred Thirty Five Dollars and Thirty Six Cents ($300,435.36).

772. Plaintiffs contend that any amounts otherwise payable remain subject to valid contractual indemnification, recoupment, or offset rights to the extent permitted by the governing transaction documents. See Exhibit 1.

773. A declaration resolving these competing contractual positions would clarify the parties' present rights and eliminate uncertainty concerning payment, default, and acceleration. See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

**Causation**

774. As a direct result of the parties' dispute concerning the Seller Note, Plaintiffs face uncertainty regarding amounts allegedly due, potential default and acceleration claims, and the proper application of recalibration, subordination, and offset provisions. See Exhibit 13; Exhibit 21.

**Relief**

775. Plaintiffs are entitled to a declaration that they are not presently in breach or default under the Amended Seller Note; that any remaining payment obligations are subject to the Amended Note's recalibration, subordination, offset, notice, and cure provisions, including the applicable Business Adjustment under the APA reducing the remaining balance by fifty percent (50%), as well as the applicable subordination, offset, notice, and cure provisions; and that Defendant or the applicable payee may not accelerate or otherwise enforce amounts except as

permitted by the governing transaction documents . See 28 U.S.C. § 2201(a); MedImmune, Inc. v. Genentech, Inc., 549 U.S. 127 (2007); Exhibit 1; Exhibit 13.

## JURY DEMAND

776. Plaintiffs request that the Court set this case for a jury trial.

## PRAYER

777. WHEREFORE, premises considered, Plaintiffs respectfully request judgment against Defendant as follows:

1. For compensatory damages in an amount to be proven at trial for the injuries and losses caused by Defendant's conduct as alleged herein;

2. For recovery of all losses, liabilities, damages, costs, expenses, and other amounts recoverable pursuant to Defendant's contractual indemnification obligations under the Independent Contractor Agreement;

3. For recovery of all amounts properly determined to be repayable under the Profit Participation Agreement, including the Twenty-Five Thousand Dollars ($25,000) in Profit Participation payments alleged to constitute unearned advances subject to repayment;

4. For enforcement of the Amended Seller Note and related transaction documents according to their terms, including recognition and enforcement of all applicable recalibration, payment, cure, subordination, offset, and other contractual limitations;

5. For damages and appropriate injunctive relief under the Defend Trade Secrets Act, including relief preventing Defendant's actual or threatened unauthorized use or disclosure of Plaintiffs' trade secrets, together with all further relief authorized by 18 U.S.C. § 1836(b)(3);

6. For damages, including treble damages, reasonable attorneys' fees, and appropriate

equitable and injunctive relief under the Lanham Act, including relief necessary to prevent further false or misleading commercial representations concerning the source, nature, characteristics, or qualities of Defendant's competing commercial services;

7. For disgorgement and other equitable relief to the extent permitted by law for financial benefits obtained through Defendant's self-dealing, exploitation, or diversion of matters entrusted to him;

8. For specific performance and preliminary and permanent injunctive relief requiring Defendant to comply with his enforceable surviving contractual obligations, including the return and non-use of Plaintiffs' confidential and proprietary information and compliance with applicable restrictions protecting Plaintiffs' commercial relationships;

9. For a judicial declaration that, effective August 15, 2026, Defendant forfeited his right to participate further in Plaintiffs' profit-sharing plan and possesses no right to additional, future, or post-termination Profit Share, except to the extent any amount is determined to have survived termination under the governing terms of the Profit Participation Agreement;

10. For a judicial declaration that Defendant's relationship with Plaintiffs under the Independent Contractor Agreement was that of an independent contractor rather than an employee, and that the parties' rights and obligations arising from that engagement are governed accordingly;

11. For a judicial declaration that the Business Adjustment was validly exercised pursuant to the Asset Purchase and Contribution Agreement, reducing the applicable payment from Seven Hundred and Fifty Thousand Dollars ($750,000) to Three Hundred and Seventy-Five Thousand Dollars ($375,000), and that the adjustment did not amend, modify, revalue, convert, or terminate the SAFE, whose remaining terms continue in full force and effect;

12. For a judicial declaration that Plaintiffs are not presently in breach or default under

the Amended Seller Note; that any remaining payment obligations are subject to the Amended Note's recalibration, subordination, offset, notice, and cure provisions; and that Defendant or the applicable payee may not accelerate or otherwise enforce amounts except as permitted by the governing transaction documents;

13. For pre-judgment and post-judgment interest, costs of suit, and reasonable attorneys' fees to the extent permitted by contract, statute, or other applicable law; and

14. For such other and further legal and equitable relief as the Court deems just and proper.

Dated: New York, New York
August 28, 2026

Respectfully submitted,

Joshua D. Brinen
**BRINEN & ASSOCIATES, LLC**
330 Seventh Avenue, Suite 501
New York, New York 10001
Telephone: (212) 330-8151
Facsimile: (212) 227-0201
jbrinen@brinenlaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Veza Agency Network, LLC, a Delaware limited liability company, Veza Growth SPV, LLC, a Delaware limited liability company, and Veza Shadow LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>Yannick Lorenz,<br><br>Defendant. | Index No.:<br><br>**VERIFICATION OF COMPLAINT** |

I, Stefan Katanic, being duly sworn, depose and state as follows:

1. I am the Manager of Veza Agency Network, LLC ("Veza"), a Delaware limited liability company, Veza Growth SPV, LLC ("VGSPV"), a Delaware limited liability company, and Veza Shadow LLC ("Shadow"), a Delaware limited liability company.

2. I am authorized to make this Verification on behalf of Veza, VGSPV, and Shadow.

3. I am competent to make this Verification and, if called as a witness, could testify to the matters stated herein.

4. I make this Verification based on my personal knowledge, my review of the books, records, files, and documents of Veza, VGSPV, and Shadow, and information provided to me by persons acting on behalf of those entities in the ordinary course of their business.

5. I have read the Complaint filed or to be filed in this action.

6. The factual allegations in the Complaint are true and correct to the best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

7. I make this Verification for filing with the Complaint in the United States District Court for the Southern District of New York.

I declare under penalty of perjury that the foregoing is true and correct.

Date: August 28th, 2026

[signature]
Stefan Katanic

STATE OF Pennsylvania

COUNTY OF Blair

The foregoing instrument was acknowledged before me via ✓ Online Notarization _ ______ Personally Appeared this 28th day of August, 2026, by Stefan Katanic, who is personally known to me or who has produced Passport as identification and who did take an oath.

Commonwealth of Pennsylvania - Notary Seal
Max Roland, Notary Public
Blair County
My commission expires July 31, 2027
Commission Number 1437406

Max Charles Roland
Notary Public
State of Pennsylvania
My Commission Expires: 07/31/2027

Notarized remotely online using communication technology via Proof.